**EFiled: May 26 2022 09:51AM EDT**
**Transaction ID 67662682**
**Case No. 2020-1061-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWART N. GOLDSTEIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-1061-JTL |
| ALEXANDER J. DENNER, JOHN G. COX, ANNA PROTOPAPAS, BRIAN S. POSNER, LOUIS J. PAGLIA, GENO J. GERMANO, JOHN T. GREENE, ANDREA DIFABIO, SARISSA CAPITAL MANAGEMENT, L.P., SARISSA CAPITAL DOMESTIC FUND LP, SARISSA CAPITAL OFFSHORE MASTER FUND LP, and SARISSA CAPITAL MANAGEMENT GP LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ADDRESSING**
**MOTIONS TO DISMISS COUNTS I AND II**

Date Submitted: March 4, 2022
Date Decided: May 26, 2022

Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOTT P.A., Wilmington, Delaware; R. Bruce McNew, COOCH & TAYLOR P.A., Wilmington, Delaware; Randall J. Baron, David T. Wissbroecker, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brett Middleton, JOHNSON FISTEL, LLP, New York, New York; *Attorneys for Plaintiff.*

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Daniel J. Kramer, Geoffrey R. Chepiga, Daniel J. Juceam, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys*

*for Defendants John G. Cox, Anna Protopapas, Brian S. Posner, Louis J. Paglia, Geno J. Germano, John T. Greene, and Andrea DiFabio.*

Stephen E. Jenkins, Richard D. Heins, ASHBY & GEDDES, P.A., Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Richard Li, M. Annie Houghton-Larsen, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Alexander J. Denner, Sarissa Capital Management LP, Sarissa Capital Domestic Fund LP, Sarissa Capital Offshore Master Fund LP, and Sarissa Capital Management GP LLC.*

**LASTER, V.C.**

Bioverativ, Inc. (the "Company") commenced its existence as a publicly traded Delaware corporation in February 2017, when it was spun off from Biogen, Inc. In May 2017, Sanofi S.A. approached two of the Company's directors—defendants Alexander J. Denner and Brian S. Posner—and expressed interest in buying the Company for around $90 per share. At that time, the Company's stock was trading in the mid-$50s.

The two directors demurred. Neither of them disclosed Sanofi's approach to the Company's board of directors (the "Board"). Instead, Denner caused a hedge fund that he controls to buy more than a million shares of Company common stock, octupling his holdings. The purchases violated the Company's insider trading policy. Denner did not disclose the purchases to the Board.

Denner stood to make massive profits if the Company was sold at a price in the range of Sanofi's bid. One impediment was Section 16(b) of the Securities Exchange Act of 1934, which requires that an insider disgorge short-swing profits from any sale that takes place less than six months after the purchase. The solution was to delay any engagement with Sanofi so that the sale would take place after the short-swing period closed.

That is exactly what Denner and Posner did. In June and again in September 2017, Sanofi followed up with Denner and Posner. Each time, Denner and Posner told Sanofi that the Company was not for sale.

In October 2017, however, the short-swing period was about to expire. This time when Sanofi came calling, Denner proposed invited Sanofi to bid as part of a pre-emptive,

single-bidder process. Denner acted unilaterally to put the Company in play. The Board knew nothing about Sanofi's inquiries.

Several weeks later, in late November 2017, Sanofi offered to acquire the Company for $98.50 per share. This was the first time that the Board learned about Sanofi's interest.

The Company's management team and its financial advisors had valued the Company at more than $150 per share using the projections in the Company's long-range plan. After receiving Sanofi's offer, the Board asked for a higher bid, and Sanofi increased its offer to $101.50. At that point, the Board countered at $105 per share, almost one-third below the Company's standalone valuation under its long-range plan. Sanofi accepted the Board's counter.

The Board then had to confront the disconnect between the Company's long-range plan and the deal price. The solution was to slash the Company's projections, and Company management proceeded to do just that. Yet nothing had changed about the Company's long-term prospects or business outlook since the arrival of Sanofi's bid.

With the benefit of a fairness opinion supported by the slashed projections, the Board approved an agreement and plan of merger with Sanofi (the "Merger Agreement") that contemplated a medium-form merger (the "Transaction"). In the first-step tender offer, holders of 65.2% of the Company's common stock tendered their shares. The Transaction closed promptly thereafter.

In this lawsuit, the plaintiff asserts that the members of the Board and three of the Company's officers breached their fiduciary duties during the sale process (the "Sale Process Claims"). The Sale Process Claims state non-exculpated claims for breach of

2

fiduciary duty against Denner, Posner, and defendant John G. Cox, the lone inside director. It is reasonably conceivable that Denner favored a sale disloyally and in bad faith to capture the profits on the shares he secretly purchased based on inside information about Sanofi's interest. It is reasonably conceivable that Posner acted in bad faith by concealing Sanofi's approach from the Board. It is reasonably conceivable that Cox had a differential interest in receiving $72.3 million in severance payments.

The Sale Process Claims also state non-exculpated claims for breach of fiduciary duty against defendants Anna Protopapas and Geno J. Germano based on their relationships with Denner. Denner is an activist investor who follows a business strategy of effecting significant change at target companies, including by putting them into play. Implementing that strategy depends on obtaining representation on the boards of target companies. Carrying out the strategy thus generates a steady stream of opportunities to put individuals on the boards of target companies. Scholars have confirmed the intuitive reality that directorships are valuable and sought after. Delaware law has long recognized that a director may be compromised by sense of gratitude for past benefits. Recent scholarship demonstrates that directors may be compromised by the promise of future rewards. The receipt of past directorships and access to a steady flow of future opportunities can be a strong motivator. Although a director's nomination to a board standing alone is not enough to call into question the director's independence from the nominating party, a pattern of facts surrounding the director's service can do the trick.

The complaint pleads a constellation of facts about Protopapas which makes it reasonably conceivable that she supported a fast sale to Sanofi because she had benefitted

3

from and wanted to keep participating in Denner's activist campaigns. Just weeks before joining the Board, Protopapas received a lucrative payout for helping Denner complete the sale of another company. She also had other professional relationships with Denner. According to the complaint, Protopapas supported a fast sale to Sanofi at a price far below Company management's assessment of the Company's standalone value. Taken together, these pled facts support a reasonable inference that Protopapas approved the Transaction because she and Denner had established a symbiotic relationship that Protopapas wanted to see continue, rather than because the Transaction was in the best interests of the stockholders.

The complaint pleads a constellation of facts about Germano that leads to a similar inference. Although Germano had not previously helped Denner with an activist campaign, he was unemployed when he joined the Board, which gave him an opportunity to restart his career. He joined the Board shortly after the spinoff. Six months later, after inviting Sanofi to bid, Denner secured a seat for Germano on the board of another company. Germano then supported the sale to Sanofi at a price far below Company management's assessment of the Company's standalone value. Taken together, these pled facts support a reasonable inference that Germano approved the Transaction because of his relationship with Denner, rather than because the Transaction was in the best interests of the stockholders.

In granting the plaintiff a pleading-stage inference sufficient to keep Protopapas and Germano in the case, this decision has taken into account that the defendants moved to dismiss under Court of Chancery Rule 12(b)(6), which imposes a lower pleading standard

than a motion to dismiss under Court of Chancery Rule 23.1, where particularized pleading is required. The court also has considered that the claims implicate enhanced scrutiny, rather than the business judgment rule. If the business judgment rule governed, then to rebut its presumption of loyalty, the plaintiff would have to plead facts sufficient to support an inference that the decision could not rationally be explained other than on the basis of bad faith. By contrast, when a case is governed by a standard more onerous than the business judgment rule, that same pleading obligation does not apply. Instead, the Delaware Supreme Court has held that a plaintiff need only "plead[] facts that support a rational inference of bad faith." *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 (Del. 2018) (TABLE).

Viewed through these lenses, the complaint pleads a combination of facts which supports a rational inference that Protopapas and Germano supported a sale because they wanted to be on Team Denner. That is only a pleading-stage inference, but it prevents Protopapas and Germano from obtaining a pleading-stage dismissal.

The complaint does not plead a similar combination of facts against defendant Louis J. Paglia. He already was serving on the Board when the spinoff took place. The complaint does not allege that Denner helped Paglia join the Board, and the complaint does not identify any other prior ties to Denner. The complaint does allege that Denner subsequently selected Paglia to serve as a director for a blank-check special purpose acquisition vehicle that Denner's hedge fund sponsored, but the complaint does not say when that appointment took place. It seems more temporally remote, and the complaint does little more than identify it in passing. Whether a complaint has pled sufficient facts to state a non-

5

exculpated claim is a matter of degree. At present, the plaintiff has not pled sufficient facts to support an inference that Paglia acted in bad faith in connection with the Transaction.

The Sale Process Claims also state claims for breach of fiduciary duty against Cox (in his capacity as an officer) and the other two officer defendants. As officers of the Company, those defendants are not entitled to exculpation.

The plaintiff separately asserts that the members of the Board and the officer defendants breached their fiduciary duty of disclosure by issuing a Schedule 14D-9 in connection with the Transaction that contained false and misleading statements and material omissions (the "Disclosure Claims"). The Disclosure Claims state non-exculpated claims for breach of fiduciary duty against all of the director and officer defendants.

The plaintiff separately asserts a claim against Denner for breach of fiduciary duty under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949), and a claim against the hedge fund Denner controlled for aiding and abetting Denner's breaches of fiduciary duty. The court will address those claims in a separate opinion.

## I.  FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents it incorporates by reference, and pertinent public documents that are subject to judicial notice.[1] At this procedural stage,

---

[1] Citations in the form "Ex. __" refer to exhibits attached to the Transmittal Declaration of Matthew D. Stachel (the "Stachel Affidavit"). Dkt. 25. Two key disclosure documents are the Offer to Purchase filed with the SEC in connection with the Transaction (the "Schedule TO") and the Schedule 14D-9 that the Company filed in response. Citations in the form "14D-9 at __" refer to the Schedule 14D-9, found at Exhibit 1 to the Stachel

6

the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

Both sides rely on public filings with the Securities and Exchange Commission (the "SEC") that are outside the four corners of the complaint. The court takes judicial notice of the filings to establish the information that was disclosed to stockholders, and "to establish formal, uncontested matters."[2] The defendants attempt to go further by relying on the public filings as accurate descriptions of what occurred, and they ask the court to draw defense-friendly inferences from those documents. Those efforts go beyond what Rule 12(b)(6) permits.[3]

Before filing suit, the plaintiff obtained books and records from the Company using Section 220 of the Delaware General Corporation Law (the "Section 220 Action"). The

---

Affidavit. Citations in the form "Schedule TO at __" refer to the excerpts of the Schedule TO, found at Exhibit 4 to the Stachel Affidavit.

[2] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *see In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 n.39 (Del. Ch. Jan. 5, 2017) ("[T]he Court may properly consider relevant portions of a proxy statement when analyzing disclosure issues, not to establish the truth of the matters asserted, but to examine what was disclosed to the stockholders."); *Abbey v. E.W. Scripps Co.*, 1995 WL 478957, at *1 n.1 (Del. Ch. Aug. 9, 1995) (Allen, C.) ("In deciding a motion to dismiss under Rule 12(b)(6), the court may judiciously rely on proxy statements not to resolve disputed facts but at least to establish what was disclosed to shareholders.").

[3] *White v. Panic*, 783 A.2d 543, 547 n.5 (Del. 2001) ("[T]he court may not employ assertions in documents outside the complaint to decide issues of fact against the plaintiff without the benefit of an appropriate factual record."); *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (explaining that the court may consider documents outside of the pleadings "when the document is not being relied upon to prove the truth of its contents").

Company offered to pay the plaintiff $50,000 to dismiss the Section 220 Action with prejudice. The plaintiff declined, and the Company produced 628 documents, including minutes, presentations, and certain emails (collectively, the "Section 220 Documents"). The parties stipulated that "[i]n the event Plaintiff . . . decides to use, or refer to, any information or documents provided by [the Company] in any complaint, petition, or other court filing, then all documents and information provided by [the Company] to Plaintiff shall be deemed incorporated by reference into the filing." *Goldstein v. Bioverativ, Inc.*, C.A. No. 2018-0156-JTL, Dkt. 20 ¶ 11 (Del. Ch. Mar. 25, 2020).

In connection with the motions to dismiss, the defendants submitted forty-one exhibits. Nineteen were Section 220 Documents. Based on the stipulation in the Section 220 Action, the defendants can refer to these documents to ensure that the plaintiff has not misrepresented their contents. The defendants go further, however, by asking the court to rely on the documents to draw inferences in the defendants' favor. A defendant may not use Section 220 documents "to rewrite an otherwise well-pled complaint." *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. Oct. 1, 2019). A stipulation incorporating Section 220 documents by reference "does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

8

This decision describes the factual background based on these principles. It is necessarily a plaintiff-friendly account because the defendants chose to fight on that battlefield.

## A. The Company's Origins

The Company started life as a business unit inside Biogen, a biotechnology and pharmaceutical company. After a proxy fight, activist investor Carl Icahn succeeded in placing directors on the Biogen board. Posner joined as an Icahn nominee in 2008, having previously helped Icahn with a proxy contest at Yahoo! Inc. Compl. ¶ 30. Denner worked for Icahn and helped develop his biotechnology strategy. He joined the Biogen board as an Icahn nominee in 2009. *Id.* ¶ 15. Icahn and his nominees pressured Biogen to sell itself or spinoff business units. *Id.* ¶ 53.

In 2012, Denner left Icahn to found a hedge fund. The keystone entity is defendant Sarissa Capital Management, L.P. ("Sarissa Capital"), a Delaware limited partnership. The general partner of Sarissa Capital is defendant Sarissa Capital Management GP LLC ("Sarissa GP"). Sarissa Capital serves as the investment advisor to two funds, defendants Sarissa Capital Domestic Fund LP and Sarissa Capital Offshore Fund LP (the "Sarissa Funds"). Denner controls the Sarissa entities through his position as the managing member of Sarissa GP and his role as Chief Investment Officer of Sarissa Capital. This decision refers to Sarissa Capital, Sarissa GP, and the Sarissa Funds collectively as "Sarissa."

Denner and Sarissa are activist investors. Denner identifies a target company. Sarissa purchases shares of the target company. Denner then seeks to cause the target

9

company to make changes that will increase stockholder value, often through a sale or breakup of the target company.

## B.    The Post-Spinoff Business

Effective February 1, 2017, Biogen spun off the Company as a new, standalone public entity (the "Spinoff"). At the time of the Spinoff, the Company generated approximately $888 million in annual revenue. It had two successful products, both treatments for hemophilia. Eloctate was a treatment for hemophilia A. Alprolix was a treatment for hemophilia B. Both were unique because they were prophylactic treatments. *Id.* ¶¶ 56–57. The Company also had a pipeline of promising products. Some of the Company's products involved collaborations with other biotechnology companies.

After the Spinoff, the Company had two primary goals: "increase sustainability of revenue generated from Eloctate and Alprolix," and "build a pipeline to enable long term growth." *Id.* ¶ 59 (internal quotation marks omitted). The Company had $325 million in cash after the Spinoff, giving it the ability to fund strategic acquisitions.

## C.    The Directors And Officers Of The Company

When the Spinoff took place, the Board had four members. Posner served as Chair, which gave him control over the Board's agenda. Denner served as the Chair of the Corporate Governance Committee, which put him in charge of nominating new directors. Posner and Denner also continued to serve on the Biogen board. *Id.* ¶¶ 14–15, 29–30.

The other two directors were Cox and Paglia. Cox served as the Company's CEO, having been an executive of Biogen since 2003. Paglia was an outside director who had served with Posner on the board of Arch Capital Group Ltd., since 2014. *See id.* ¶¶ 21, 35.

10

Defendant John T. Greene was the Company's Chief Financial Officer. Defendant Andrea DiFabio was the Company's Executive Vice President, Chief Legal Officer, and Corporate Secretary. This decision refers to Greene, DiFabio, and Cox (in his capacity as an officer) as the "Officer Defendants."

On February 28, 2017, the Board voted to expand to five directors. The Board appointed Protopapas to fill the newly created directorship. *Id.* ¶ 25.

Denner and Protopapas had a history. Denner had nominated Protopapas to serve on the board of Ariad Pharmaceuticals, Inc., as part of a Sarissa-led proxy contest. After Protopapas joined the Ariad board in April 2015, Denner and Protopapas shepherded Ariad into a sale to Protopapas' former employer, Takeda Pharmaceutical Company, Limited. Denner and Protopapas served on the three-person Coordination Committee that led the sale process. Denner and Protopapas retained Lazard Frères & Co. LLC ("Lazard") as the financial advisor to the Coordination Committee. The sale of Ariad closed on February 15, 2017. For less than two years of service as a director, Protopapas netted $2.2 million for her shares and options. Sarissa purchased its stake in Ariad for $49 million in 2013. Just over three years later, Sarissa netted a profit of $260 million. *Id.* ¶ 26.

Denner and Protopapas also knew each other from Mersana Therapeutics, Inc., where Protopapas had served as President and CEO since 2015. Sarissa is one of Mersana's three largest stockholders, owning approximately 8% of the outstanding shares. *Id.* ¶ 27.

Protopapas joined the Board less than two weeks after the sale of Ariad. As the chair of the Corporate Governance Committee on a board with just four members, Denner played

11

a major role in securing the appointment of Protopapas. After her appointment, Protopapas joined Denner on the Corporate Governance Committee.

**D.     The 2017 Annual Plan**

In the ordinary course of business, the Company prepared an Annual Operating Plan (the "Annual Plan"). Executive compensation was tied to the Annual Plan.

During a meeting of the Board on February 28, 2017, Company management presented the Annual Plan for that year. The 2017 Annual Plan projected $1.061 billion in revenue, $272 million in net income, and $242 million in adjusted free cash flow for 2017. *Id.* ¶ 71.

Company management also presented a plan for the Company's product pipeline. Company management identified potential collaborations and strategic acquisitions, including the creation of a "Sickle Cell Disease Franchise" through two key acquisitions. The presentation noted the Company's strong cash position and observed that "early stage deals are affordable." *Id.* ¶¶ 61–62 (internal quotation marks omitted).

In April 2017, Company management presented an update to the Board that identified three immediate acquisitions. The presentation noted that after making the acquisitions, the Company would have substantial cash and additional financing capacity for other strategic acquisitions. *Id.* ¶ 63.

On May 1, 2017, Company management presented the Board with the potential acquisition of True North Therapeutics, a company that had developed a treatment for a blood disorder known as cold agglutinin disease. The United States Food and Drug Administration (the "FDA") had given True North's treatment a Breakthrough Therapy

12

designation, and the treatment had shown promise in early trials. *Id.* ¶ 64. Using Company management's projections, True North was valued at $1.6 billion for the base case, $3.5 billion for the upside case, and $525 million for the downside case. *Id.*

On May 4, 2017, the Company announced its results for the first quarter of 2017, its first as a public company. The Company reported revenue of $259 million, a 35% year-over-year increase. *Id.* ¶ 72. But the Company's stock did not react positively and actually traded down by 1%. *Id.* ¶ 108 n.5.

## E.     Sanofi Expresses Interest.

On May 8, 2017, Lazard contacted Denner and told him that Sanofi was interested in making an offer to acquire the Company. Denner and Lazard had worked together on the sale of Ariad, which closed only a few months earlier. Three days after his call with Lazard, Denner attended meetings of the Board and the Corporate Governance Committee. Denner did not disclose the information he received from Lazard. *Id.* ¶¶ 87–88.

During the May 11 meeting of the Board, Company management increased its revenue projection for 2017 by $17 million, reflecting growth of 22%. *Id.* ¶ 73. Company management also reported on discussions with True North and a second potential acquisition candidate. *Id.* ¶ 65.

Also during the meeting, the Board voted to expand to six directors and filled the newly created directorship with Germano. Before his appointment, Germano was unemployed after a nine-month stint as President of Intrexon Corporation. Germano had joined Intrexon with the goal of becoming CEO, but once it became clear that Intrexon's founder and CEO did not plan to retire, Germano resigned. *Id.* ¶ 39. Germano saw his

13

position with the Company as an opportunity to revitalize his career. This decision refers to Germano, Denner, Paglia, Posner, Protopapas, and Cox (in his capacity as a director) as the "Director Defendants."

On May 12, 2017, the day after the Board meeting, Sanofi made contact again. Serge Weinberg, the chairman of Sanofi's board of directors, contacted Posner about a transaction. According to the Schedule 14D-9, Posner responded that the Company was not for sale. 14D-9 at 18. Weinberg and Posner spoke again by phone on May 15, and they scheduled an in-person meeting for May 19. Compl. ¶ 89.

On May 19, 2017, Posner and Denner met with Weinberg and Olivier Brandicourt, Sanofi's CEO. Weinberg and Brandicourt said that Sanofi was interested in buying the Company at a price "in the range of $90 per share in cash." *Id.* ¶ 90. On the same day, the Company's stock closed at $54.86 per share. *Id.* Sanofi's proposed price represented a premium of 64.1% over market.

During the meeting, Weinberg and Brandicourt said that Sanofi only would consider a friendly transaction. Sanofi had been burned in 2016 when it made a hostile bid for Medivation, Inc. Sanofi offered to pay more than 40% over market, yet Medivation declined. Sanofi made its offer public, and Pfizer emerged as the successful acquirer. *Id.* ¶ 91.

According to the Schedule 14D-9, Posner and Denner responded that the Company was "focused on executing its current business plan and growing its operations as a standalone business." 14D-9 at 18. According to the Schedule 14D-9, Posner said he would report on Sanofi's interest to the Board. *See id.*

14

The complaint alleges that Denner and Posner did not inform the Board about their meeting with Weinberg and Brandicourt. *See* Compl. ¶ 92. The Schedule 14D-9 states that Posner "updated each member of [the] Board of Directors regarding the substance of the May 19, 2017 meeting." 14D-9 at 18. The plaintiff alleges that this allegation is false. Compl. ¶ 92. The Company did not produce any Section 220 Documents that would validate that statement. The minutes that the Company produced do not contain any reference to an update, and the Section 220 Documents did not contain any emails or other materials that reflect an update. At this procedural stage, the court must accept the complaint's allegation as true.

Posner and Weinberg spoke again on May 23, 2017. According to the Schedule 14D-9, Posner reiterated that the Company was not for sale. 14D-9 at 18.

On May 23, 2017, the Company announced that it had signed a definitive agreement to acquire True North. Compl. ¶ 65. The acquisition expanded the Company's pipeline of blood disorder treatments to include True North's treatment for cold agglutinin disease.

## F. Denner Covertly Buys Over One Million Shares Of Stock.

Before Denner's meeting with Sanofi, Denner and Sarissa did not have large holdings of Company common stock. Denner owned 3,945 shares. Sarissa owned 155,000 shares. *Id.* ¶ 18.

Just days after the meeting, Denner caused Sarissa to begin purchasing Company common stock.

- On May 24, 2017, Sarissa purchased 340,000 shares of Company stock.

- On May 25, 2017, Sarissa purchased 130,000 shares of Company stock.

15

- On May 26, 2017, Sarissa purchased 450,000 shares of Company stock.

- On May 30, 2017, Sarissa purchased 90,000 shares of Company stock.

*Id*. ¶ 94.

In total, during the week after his meeting with Sanofi, Denner caused Sarissa to pay $56.3 million to purchase 1,010,000 shares of Company stock at prices between $54.16 and $57.21 per share. *Id.* At Sanofi's proposed transaction price of $90 per share, Sarissa would make a profit of nearly $35 million.

Denner did not tell the Board about the stock purchases. The purchases did not trigger a Schedule 13D filing because Denner kept Sarissa's holdings below 5% of the Company's outstanding voting power.[4]

It is reasonably conceivable that Denner's purchases violated the Board's insider trading policy, which stated:

> We will not use information concerning [the Company] or information from our business partners for personal benefit. To help ensure that you do not engage in prohibited insider trading and avoid even the appearance of an improper transaction, [the Company] has adopted an Insider Trading Policy, which is available on our intranet site or from Legal. Our Insider Trading Policy prohibits all of our directors, officers, employees, and temporary staff worldwide, as well as their immediate family members, from trading securities, or disclosing or passing along information to others who then trade on the basis of material nonpublic information. You may only purchase or sell a company's securities if you are not in possession of material non-public information about such company. Certain individuals are subject to additional trading restrictions, which limit those individuals to trading in the Company's securities only during certain open trading windows.

___

[4] A person who acquires "beneficial ownership" of more than 5% of a class of voting stock must file a Schedule 13D with the SEC within ten days of acquiring the stock. *See* 17 C.F.R § 240.13d-1(a).

> Material information is information that a reasonable investor would consider important in deciding whether to buy, sell, or hold a security. Information is generally considered "public" after it has been publicly available for at least one business day after disclosure. Violations of the insider trading laws are severe, and include civil and criminal fines and penalties. It is your responsibility to ensure that you do not violate the insider trading laws or our Insider Trading Policy.

Compl. ¶ 95.

The complaint supports an inference that Denner caused Sarissa to buy the shares based on inside information about Sanofi's interest in acquiring the Company. The complaint supports an inference that Denner caused Sarissa to buy the shares with the intention of making a quick profit on the sale of the Company.

Section 16 of the Securities Exchange Act stood as a potential impediment to Denner's ability to make a profit. Under Section 16, an insider and his affiliates must disgorge short-swing profits from purchases and sales of shares within a six-month period. *See* 15 U.S.C. § 78p(a)(1), (b). To avoid liability for a short-swing profit, a transaction with Sanofi could not close until after November 30, 2017.

## G. Denner Continues His Discussions With Sanofi.

On June 13, 2017, Denner met with a representative of Lazard. According to the Schedule TO that Sanofi later filed in connection with the Transaction, Denner and Lazard discussed "a potential transaction involving Parent and the Company" and "[n]either party discussed the potential terms of any such transaction." Schedule TO at 15. The Schedule 14D-9 did not disclose this meeting, and there is no mention of the meeting in any of the minutes that the Company produced in the Section 220 Documents.

17

Meanwhile, the Company began evaluating a potential acquisition of Novimmune, a company that had developed a treatment for Hemophagocytic Lymphohistiocytosis. The FDA had given Novimmune's treatment a "Breakthrough Therapy" designation, and the European Medicines Agency had given it a "Priority Medicine" designation. Compl. ¶ 66. That same month, the Company engaged in discussions with an entity named Bellicum about a collaboration on a treatment for genetic blood disorders. *Id.* ¶ 67. On June 28, 2017, the Company completed its acquisition of True North. *Id.* ¶ 65.

On June 30, the Board held a regularly scheduled meeting. Denner and Posner did not disclose their discussions with Lazard and Sanofi. *Id.* ¶ 100.

## H.     The Company Continues To Outperform.

On August 3, 2017, the Company reported its positive results for the second quarter of 2017, including year-over-year revenue growth of 37%. In the first half of 2017, the Company already had exceeded the full-year estimate of adjusted free cash flows projected in the 2017 Annual Plan. The Company also reported a strong balance sheet, with $465 million in current assets, $137 million in cash, and $235 million in net working capital. *Id.* ¶ 75.

In its earnings report, the Company updated its annual outlook to account for its acquisition of True North. After that acquisition, the Company projected revenue growth of 23–25%, representing a 1–3% increase over the Company's projections from the first quarter of 2017. *Id.* ¶ 76.

On the Company's earnings call, Cox emphasized the value of the True North acquisition. He also announced that the FDA had granted the Company's Investigational

18

Drug Application for an experimental treatment that promised to provide longer-lasting treatments for hemophilia A. And Cox touted the Company's positive reception at the International Society on Thrombosis and Haemostasis Congress in Berlin, Germany. *Id.* ¶ 74.

Despite this good news, the Company's stock did not react positively. The one-day stock price reaction to the second quarter results was 0.0%. *Id.* ¶ 108 n.5.

On August 24, 2017, Company management reported to the Board that revenue for the second quarter of 2017 exceeded the projections in the 2017 Annual Plan by $49 million. As of that date, the Company was on track to exceed its 2016 revenue by 25%, which was "at the upper bound of updated guidance." *Id.* ¶ 77 (cleaned up). The Company also announced a collaboration with Invicro, a company that provides imaging services and analysis for pharmaceutical research and development. *Id.* ¶ 68.

In September 2017, the Company entered into other collaborations. The Company signed an agreement with Bicycle Therapeutics for a "game changer" treatment for hemophilia A. The Company also obtained a license for Catabasis' research into sickle cell disease. *Id.* ¶¶ 65, 69.

## I.     Sanofi Continues To Express Interest.

On September 12, 2017, Weinberg contacted Posner to reiterate Sanofi's interest in the Company. The next day, the Board met. The minutes of the meeting do not provide any indication that Posner disclosed his discussion with Weinberg to the Board. There was no indication in the Section 220 Documents that Posner disclosed his discussion to the Board.

19

Weinberg and Posner spoke again on September 15. According to the Schedule 14D-9,

> Mr. Weinberg expressed Sanofi's interest in pursuing an acquisition of the Company and Mr. Posner stated that our Board of Directors remained confident in the future of the Company as a standalone business and was not interested in pursuing such a transaction at that time. Following the phone call with Mr. Weinberg, Mr. Posner provided a further update to our Board of Directors regarding the substance of the conversation.

14D-9 at 18. Once again, there was no indication in the Section 220 Documents to support the assertion that any update was provided to the Board.

During a meeting of the Board on September 13, Company management provided a presentation titled "Investor Engagement Strategy H2 2017." Compl. ¶ 103. The presentation included a slide titled "Overview of Current Investor Base" that identified the Company's top twenty-five stockholders. To compile the information, the Company used Schedule 13F filings as of March 31, 2017, and one investor's more recent filing on Schedule 13D. *Id.*

Sarissa's stock purchases were substantial enough to appear on the list, but because the purchases occurred after March 31 and had not triggered the filing of a Schedule 13D, Sarissa did not show up on the slide. Denner did not disclose the position. Neither Denner nor Posner informed the Board about their discussions with Sanofi. *Id.* ¶ 101.

During the same meeting, Company management presented a set of long-range projections in a document titled "5 Year Forecast & 2018 Financial Targets" (the "September LRP"). *Id.* ¶ 78. The September LRP projected "double-digit revenue growth" and a 20% increase in net income by 2022. *Id.* Company management adjusted its revenue

20

projections for 2017 upward from $1.061 billion to $1.142 billion, an increase of 7.63%. *Id.* ¶ 80; *see id.* ¶ 109 (comparison of Q1 and Q2 results to analyst consensus). The presentation included a sum-of-the-parts valuation which estimated the value of the Company's common stock to be $83.24 per share. *Id.* ¶ 80.

## J.    Denner Invites Sanofi To Bid.

On October 20, 2017, Lazard contacted Denner to reiterate Sanofi's interest in buying the Company. With the short-swing deadline expiring soon, the time was ripe for Denner to act. Without informing the Board or obtaining Board approval, Denner told Lazard that the Board would "consider entering into discussions with Sanofi regarding a potential transaction, but that Sanofi must offer a 'preemptive' price, i.e., a price that is sufficiently high that it would obviate the need for a pre-signing market check." *Id.* ¶ 104 (cleaned up).

By expressing a desire to obviate the need for a pre-signing market check, Denner signaled his support for a single-bidder process. The complaint alleges that after causing Sarissa to purchase a substantial block of Company stock based on the prospect of a sale, it was more important for Denner to ensure that the Company was sold, rather than to push for the best possible price. Denner's goals meshed with Sanofi's objective of avoiding a competitive process. *See id.* ¶ 105.

Other than Sarissa's purchases of the Company's stock and the looming expiration of the short-swing disgorgement period, nothing made October 2017 a more advantageous time for a sale—at least from the Company's perspective—than May 2017, when Sanofi first approached Denner and Posner. If anything, the Company's standalone prospects had

21

improved. The Company had consistently outperformed its own internal projections and analysts' estimates. The Company had completed its acquisition of True North and engaged in new collaborations. The Company also possessed extensive, non-public information about the value of its pipeline. *Id.* ¶¶ 107–14.

From Denner and Sarissa's perspective, however, October 2017 was an advantageous time for a sale, because the Section 16 disgorgement period was about to expire. That meant Sarissa could profit from a quick deal.

On October 30, 2017, Company management learned about Sarissa's stock purchases. Guggenheim Capital LLC ("Guggenheim"), a financial advisor who worked with Company management, sent Cox and Greene a presentation that identified the top buyers of the Company's stock in the second quarter of 2017. Sarissa was the seventh largest buyer. Greene and Cox did not disclose Sarissa's position to the Board. *Id.* ¶ 106.

## K.    Sanofi's Bid

On November 3, 2017, Sanofi made a non-binding offer to acquire the Company for $98.50 per share. *Id.* ¶ 107. The offer fell in the range that Weinberg and Brandicourt had suggested in May 2017.

In the non-binding offer letter, Sanofi wrote

*As discussed in our meeting back in May and our subsequent calls*, we have been following the developments at Bioverativ . . . very closely and have great respect for the success that has been achieved to date, including the launches of ELOCTATE® and ALPROLIX®, the execution of the spinoff from Biogen, and recent business development initiatives such as the acquisition of True North Therapeutics.

Ex. 7 at 1 (emphasis added). Sanofi's letter thus indicated that Sanofi and Posner had engaged in discussions about a potential transaction throughout 2017. Yet according to the Schedule 14D-9, Posner had told Weinberg in May 2017 that the Company "was not for sale" and Weinberg acknowledged "that the matter was now closed." 14D-9 at 18. Sanofi's letter calls into question the Company's claims that the May meetings between Posner and Weinberg did not include any discussion about a transaction.

The Company's stock closed on November 3, 2017, at $54.01 per share, roughly equal to its price on May 23, 2017. Compl. ¶ 107. The Company's stock price had not reacted favorably to any of the positive news in the interim. Internally, Company management projected that the Company would continue to exceed analysts' expectations "into 2018 and [b]eyond*." Id.* ¶ 110.

After receiving Sanofi's bid, the Board retained Guggenheim and J.P. Morgan Securities LLC ("JP Morgan") as its financial advisors. The Board retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as its legal counsel.

## L.    The November LRP

To help the financial advisors value the Company as a standalone entity, the Board directed Company management to update the September LRP. *See id.* ¶ 115. Company management responded by creating projections that covered a longer period. In the September LRP, the projection period ended in 2022. In the November version (the "November LRP"), the projection period extended to 2035. Company management also revised the projections to reflect third quarter results, which beat analyst expectations.

23

The November LRP also modified certain assumptions for the Company's products. Company management increased the projected market share for Eloctate from 19.5% to 28% in 2022, resulting in projected 2021 revenue increasing from $1.388 billion to $1.701 billion. Company management also increased the estimated probability of success for BIVV-009 from 67% to 85%. That change boosted projected revenue by approximately $635 million through 2027. *Id.* ¶ 83.

Not all of the changes were more bullish. Company management made a substantial downward revision to the projected revenue from BIVV-001, which caused revenue in 2027 to decrease from $1.5 billion in the September LRP to $850 million in the November LRP. *Id.* The November LRP also did not project uninterrupted revenue growth. Instead, it forecasted that overall revenue would peak at $5.445 billion in 2029 and decline thereafter, reaching a steady state in the range of $4.8 to $4.9 billion by 2033. *See id.* ¶ 145.

**M.     A Value Of $150.21 Per Share**

Company management presented the November LRP to the Board on November 21, 2017. During the meeting, Guggenheim presented a valuation of the Company based on the November LRP. A sum-of-the-parts analysis resulted in a valuation of $150.21 per share. *See* Compl. ¶ 82.

Company management, the Board, and the Company's financial advisors engaged in a detailed discussion regarding the financial modeling that underscored the November LRP. They also discussed the Company's performance. Guggenheim noted that the Company had "outperformed the broader indices and its peer groups." *Id.* ¶ 111.

24

Guggenheim also noted that analysts were assigning significant value to the Company's products and had begun to recognize the value of its pipeline.

Guggenheim's presentation included an analysis of Sanofi's failed attempt to acquire Medivation. Guggenheim noted that after a competitive process, Pfizer paid 55.2% more than Sanofi's initial offer. *Id.* ¶ 116 n.6. Guggenheim's presentation suggested that the Company similarly could obtain a much higher price if it engaged in a competitive sale process.

Guggenheim noted, however, that the Company could not engage with any parties who had approached Biogen about a transaction involving the Company before the Spinoff. The Spinoff was structured as a tax-free distribution of common stock. Under the relevant provisions of the tax code, any change in control of the Company would result in the Spinoff becoming taxable to Biogen and its stockholders if (i) the change in control occurred within two years of the date of the Spinoff and (ii) before the Spinoff, Biogen had engaged in "substantial negotiations" with the acquirer regarding a sale of the Company. 26 C.F.R. § 1.355-7(b); *see* 26 U.S.C. §§ 355(a), 368(a)(1)(D). As part of the Spinoff, the Company entered into a Tax Matters Agreement with Biogen in which the Company agreed not to engage in any change-in-control transaction without first providing Biogen with an unqualified opinion from the Company's tax counsel attesting that the transaction would not jeopardize the tax-free status of the Spinoff. *See* 14D-9 at 20; Ex. 2 § 7.01(c). Under the Tax Matters Agreement, the Company bound itself to indemnify Biogen for any taxes resulting from a change in control at the Company. *See* Ex. 2 §§ 2.01(b), 7.04(a)(i).

25

The two-year restricted period would not end until February 1, 2019, over a year in the future (the "Restricted Period"). *See id.* § 1. During the meeting of the Board on November 21, 2017, Paul Weiss told the directors that until the Restricted Period ended, the Company could not engage credibly with any companies that had engaged with Biogen before the Spinoff. Those buyers would know that any transaction with them would trigger a massive liability for the Company under the Tax Matters Agreement. They would not believe the Company was seriously interested in that prospect. *See* Compl. ¶ 153.

Guggenheim advised that when identifying potential buyers other than Sanofi, it had considered whether the companies had engaged with Biogen before the Spinoff. Those buyers were off limits. Guggenheim's analysis and Paul Weiss' advice implied that the Company could generate a more competitive process and unlock more value if it waited until 2019, when it could engage with a broader field of potential acquirers.

The Board met again on November 25, 2017. At the meeting, the Board agreed that Sanofi's offer undervalued the Company. The Board decided not to contact potential competing bidders, in part because of the Spinoff-related restrictions. Instead, the Board directed Company management to attempt to convince Sanofi to increase its offer by providing a management presentation to discuss the November LRP. *Id.* ¶ 118. The Board authorized Company management to enter into a confidentiality agreement with Sanofi that included a standstill provision and provided for exclusivity.

**N.     The Management Presentation**

On November 27, 2017, Posner called Weinberg to deliver the message that Sanofi's offer undervalued the Company. He also told Weinberg that the Company was willing to schedule a management presentation for Sanofi.

On December 14, 2017, the Board received a preview of the management presentation. Company management also discussed the November LRP with the Board. The Board did not ask Company management to make any revisions to the November LRP. *See id.* ¶ 121.

On December 18, 2017, Company management met with Sanofi and presented a version of the November LRP that projected the Company's performance through 2022. That version included slight upward revisions to the projections from the original November LRP. The presentation highlighted the Company's impressive growth in its short history as a public company. *Id.* ¶ 122.

After the meeting, Sanofi sent the Company a list of follow-up questions. *Id.* ¶ 123. In its responses, management gave answers consistent with the November LRP and represented that it had "been conservative in [its] assumptions." *Id.*

On December 19, 2017, Company management presented the 2018 Annual Plan to the Board. The 2018 Annual Plan adopted the November LRP's projections of a 20% increase in revenue and a 3% increase in operating margin for 2018. The 2018 Annual Plan projected a slight increase over the November LRP in operating expense growth and a slight decrease compared to the November LRP in the Company's effective tax rate. The

2018 Annual Plan also increased the estimate of the Company's share of the global hemophilia A treatment market from 40% to 50% over the next ten years. *Id.* ¶¶ 84–85.

The plaintiff is entitled to the inference that by incorporating the November LRP in the 2018 Annual Plan, Company management demonstrated confidence in the November LRP and showed that it was not a selling document intended to induce Sanofi to pay more. It was a set of numbers that Company management was prepared to use to run the Company.

Later that day, Lazard contacted JP Morgan and Guggenheim to schedule an in-person meeting on January 3, 2018. *Id.* ¶ 125. On December 29, 2017, Lazard contacted Denner about Sanofi's expectations for the meeting. Lazard told Denner that Sanofi expected "to have a serious discussion on price." *Id.* ¶ 126 (cleaned up).

## O.     The Company And Sanofi Reach An Agreement On Price.

During the meeting on January 3, 2018, Sanofi offered to acquire the Company for $101.50 per share. *Id.* ¶ 127. That offer represented a 3% increase from its previous offer of $98.50 per share.

That same day, the Board convened telephonically to consider the offer. The Board discussed the updated November LRP and directed Company management to obtain an updated valuation from its financial advisors. The Board did not make a decision but agreed to reconvene the next morning.

On the night of January 3, an analyst at JP Morgan sent an email to Guggenheim and other JP Morgan employees that stated, "As per request from Management, please find attached preliminary illustrative valuation and sensitivities. The materials are based off

28

latest Management working model which reflect higher share count, lower tax rate and changes in assumptions to BIVV001 (pricing and share)." *Id.* ¶ 129 (internal quotation marks omitted). The model contained an updated sum-of-the-parts analysis that valued the Company at $158.16 per share. *Id.* Guggenheim forwarded the model to the Board. *Id.* ¶ 130.

On January 4, 2018, the Board reconvened at 8:00 a.m. What followed is difficult to pin down. The Section 220 Documents contained a set of minutes for the meeting (the "January 4 Minutes") that depicts what the plaintiff views as an embellished account. The Schedule 14D-9 tracks the January 4 Minutes.

The well-pled allegations of the complaint support the following account: After receiving input from Company management and its advisors, the Board decided to counter Sanofi's offer at $105 per share, a mere 3.4% increase over Sanofi's offer of $101.50 per share. The Board selected that price even though the only valuation analysis it had showed that the Company was worth $158.16 per share, almost 50% more than the counteroffer that the Board made.

The Board authorized Denner to convey the counteroffer to Lazard. Before Denner had the opportunity to set up the call, Lazard contacted Denner. To take the call, Denner left the meeting. He passed along the counteroffer, and Lazard conveyed it to Sanofi.

Before Denner returned to the meeting, Lazard called back and reported that Sanofi had accepted the offer, conditioned on the Company granting exclusivity through January 26, 2018. Denner then rejoined the meeting and conveyed Sanofi's conditional

acceptance. The Board voted to authorize the grant of exclusivity, and Denner informed Lazard. *See id.* ¶ 132.

## P.    The Fairness Projections

The agreed-upon price of $105 per share created a problem for the Board and its financial advisors. The November LRP supported a far greater standalone valuation. On November 21, 2017, the Board received an analysis that valued the Company at $150.21 per share. On January 3, 2018, just before agreeing to a counteroffer of $105 per share, the Board received an analysis that valued the Company at $158.16 per share. And Company management had used the November LRP to generate and present the 2018 Annual Plan.

Everyone knew that the financial advisors would have difficulty providing fairness opinions based on the November LRP. The solution was to create a lower set of projections for the bankers to use (the "Fairness Projections").

Cox and Greene assisted Guggenheim in creating the Fairness Projections. On January 17, 2018, while the Company and Sanofi were exchanging drafts of the Merger Agreement, Guggenheim forwarded Greene a comparison of the November LRP with a much lower model. Copying Cox, Greene replied:

> We also need macro assumptions that provide context as to why we have taken a less optimistic view than what was previously shared with the board. . . . [W]hat are the competitive dynamics preventing the growth that was in the December model? It should address [cold agglutinin disease] and the . . . [hemophilia] products.
>
> This should be a singular page which precedes the detailed assumptions change. It should make the detail slide simply detail in case there is a high level of curiosity.

*Id.* ¶ 138 (omissions in original) (internal quotation marks omitted).

30

On January 19, 2018, the Board met for an update on the process. Greene presented the Fairness Projections in a slide deck titled "Project Supercar Financial Model: Updated Assumptions." *Id.* ¶ 139. The Board had not seen the Fairness Projections before that meeting. Greene noted that the Fairness Projections had been "revised from management's previous presentation on November 21, 2017," and the presentation stated euphemistically that Company management had made "refinements to the financial model." *Id.* Those "refinements" reduced the Company's valuation by approximately three billion dollars.

The presentation included the following slides that attempted to explain the changes.

**Valuation Update**

- Corvette standalone financial model assumptions prepared to inform senior leadership and Board of near-term investment and long-term trends in the business

- In late November 2017, Management reviewed a preliminary long-term forecast and valuation with the Board and underlying assumptions

- Following Board dialogue as well as evaluation of additional external and internal information, refinements to the financial model were made primarily impacting the estimated value of the Hemophilia A and Complement programs

- Updated forecast and valuation reflects the following changes:
  - Commercial / competitive dynamics more challenging in Hemophilia A:
    - Lower prophylaxis use
    - Increased Hemlibra uptake
    - Short acting durability more sustained
  - CAgD prevalence and severity decreased
  - Probability of successful commercialization of CAgD reduced

- Valuation adjusted from $14B; $150 / share to $11B; $99 / share

Bioverativ



*Id.* In total, the Fairness Projections reduced the Company's projected revenue by $23.7 billion compared to the November LRP. *Id.* ¶¶ 145–46. The valuation was "adjusted from $14B; $150 / share to $11B; $99 / share." *Id.* ¶ 139.

To achieve this dramatic reduction in value, Company management changed a number of key assumptions. The Fairness Projections

- Reduced projected market and patient share for hemophilia A in the US by 6%;

- Reduced market expansion for hemophilia A from more than eleven markets to only seven markets;

- Reduced projected direct markets revenue and patient count for hemophilia A;

- Reduced projected cold agglutinin disease worldwide prevalence from 16 per million to 15 per million;

- Reduced projected probability of the successful commercialization of cold agglutinin disease by 9% and pushed ex-U.S. launch back one year; and

- Reduced projected cold agglutinin disease revenues from $1.5 billion to $800 million.

*Id.* ¶ 142. There was no new information to support the changes. *See id.* at Ex. A. The only significant event that took place between November 21, 2017, and January 18, 2018, was the Board's need to justify a price of $105 per share.

**Q.    The Parties Sign The Merger Agreement.**

Between January 19, 2018, and January 21, 2018, the parties exchanged multiple drafts of the Merger Agreement. On January 21, 2018, the Board met to consider what would become the final draft of the agreement.

During the January 21 meeting, Guggenheim and JP Morgan delivered their fairness opinions. Both firms relied on the Fairness Projections. Their presentations did not discuss the downward revisions that resulted in the Fairness Projections. The Board did not discuss the downward revisions or the higher valuation analyses that the Board had considered less than three weeks before. *Id.* ¶ 141.

At the meeting, the Board voted to approve the Merger Agreement. S*ee* Ex. 22. At the price of $105 per share, the Transaction valued the Company at approximately $11.6 billion. Ex. 23 at 2.

The Merger Agreement contemplated a two-step merger transaction under Section 251(h) of the Delaware General Corporation Law (the "DGCL"). In the first step, an indirect, wholly owned subsidiary of Sanofi would commence a tender offer to purchase all of the outstanding shares of common stock of the Company for $105 per share in cash

(the "Tender Offer"). If holders of a majority of the Company's outstanding common stock tendered shares, then the subsidiary would close the Tender Offer. In the second step, the subsidiary would merge into the Company, with all outstanding shares of the Company being converted into the right to receive the Transaction price. After the Transaction, the Company would continue as an indirect, wholly owned subsidiary of Sanofi.

In the Merger Agreement, the Board agreed to recommend that stockholders of the Company tender their shares in the Tender Offer. MA § 4.03(b). The Company also agreed that between signing and closing, the Company would not solicit competing offers to acquire the Company. *Id.* § 6.02(a). The Merger Agreement permitted the Board to change its recommendation if the Company received a "Superior Proposal," defined as "a bona fide written Acquisition Proposal . . . that the Company Board determines in its good faith judgment . . . would, if consummated, result in a transaction that is more favorable to the Company's stockholders . . . from a financial point of view than the Transaction[]." *Id.* § 1.01. If the Company elected to terminate the Merger Agreement in response to a Superior Proposal, then the Company would be obligated to pay a termination fee of $326 million, equal to 2.81% of the Transaction price. *Id.* § 9.04.

After the meeting on January 21, 2018, the Company and Sanofi executed the Merger Agreement. Simultaneously with the execution of the Merger Agreement, Paul Weiss delivered the tax opinion contemplated in the Tax Matters Agreement.

Sanofi commenced its Tender Offer and issued a Schedule TO on February 7, 2018. That same day, the Company issued its recommendation statement on Schedule 14D-9. As

34

discussed below, the complaint alleges that the Schedule 14D-9 misstated or omitted material information.

### R.    The Transaction Closes.

On March 7, 2018, the Tender Offer closed. Stockholders tendered shares equal to approximately 65.2% of the Company's outstanding common stock. On March 8, 2018, the second step of the Transaction closed. Compl. ¶ 38.

Denner and Sarissa received $155.6 million for their shares, representing a profit of $49.7 million. Denner received $2.2 million for his unvested options and restricted stock units ("RSUs"). *Id*. ¶¶ 18–19.

Cox received $72.3 million in severance benefits. Under his employment agreement, Cox received $69 million in single-trigger benefits when the Transaction closed. The remaining $3.3 million were double-trigger benefits that Cox only would receive if he was terminated without cause. Sanofi, however, agreed that Cox would be deemed to have been terminated without cause on October 1, 2018, so Cox received those amounts as well. Cox also received $7 million for his shares in the Company. As a result, Cox made a total of $79.3 million in connection with the Transaction. That amount dwarfed Cox's average compensation of $11.6 million per year in 2016 and 2017. *Id*. ¶¶ 22–24.

Posner received $2.5 million for his unvested options and RSUs that were accelerated as a result of the Transaction. He also received $702,765 for his shares of stock in the Company. His compensation as a director of the Company in 2017 was $640,022. *Id.* ¶¶ 31–32.

35

Protopapas received $1.8 million for her unvested options and RSUs that were accelerated as a result of the Transaction. She also received $110,880 for her shares of stock in the Company. Her compensation as a director of the Company in 2017 was $513,849. *Id.* ¶ 28.

Germano received $1.7 million for his unvested options and RSUs that were accelerated as a result of the Transaction. Germano did not own stock in the Company at the time of the Transaction. The complaint does not identify Germano's compensation as a director in 2017. *Id.* ¶ 40.

Paglia received $2.2 million for his unvested options and RSUs that accelerated as a result of the Transaction. He also received $530,880 for his shares of stock in the Company. His compensation as a director of the Company in 2017 was $549,018. *Id.* ¶ 36.

Greene received over $17 million for his unvested options and RSUs that were accelerated as a result of the Transaction. Greene also received over $1.4 million in severance payments. Greene received $52,500 for his shares of stock in the Company. By contrast, Greene's total compensation in 2017 was $5.1 million. *Id.* ¶¶ 44–46.

DiFabio received over $13 million for her unvested options and RSUs that were accelerated as a result of the Transaction. DiFabio also received $1.4 million for her shares of stock in the Company. By contrast, DiFabio's total compensation in 2017 was $3.4 million. *Id.* ¶¶ 49–51.

On the day after the Transaction closed, the Company amended its Form 10-K filing to disclose that Germano served as a director of The Medicines Company. Denner secured that position for Germano.

36

## S.     This Litigation

On March 7, 2018, the plaintiff filed the Section 220 Action. As noted, the Company offered to pay the plaintiff $50,000 to dismiss the Section 220 Action with prejudice. The plaintiff declined. The plaintiff and the Company eventually reached an agreement on the production of the Section 220 Documents.

Two months after the dismissal of the Section 220 Action, the plaintiff filed this lawsuit. The complaint asserts four counts:

- Count I asserts that the Director Defendants breached their fiduciary duties by approving the false, incomplete, and materially misleading Schedule 14D-9. Count I also asserts that the Director Defendants breached their fiduciary duties by failing to obtain the highest value reasonably available for the Company's stockholders in the Transaction, including by favoring their own interests instead of those of the Company's stockholders. *Id.* ¶¶ 162–66.

- Count II asserts that the Officer Defendants breached their fiduciary duties by preparing the false, incomplete, and materially misleading Schedule 14D-9. Count II also asserts that the Officer Defendants breached their fiduciary duties through their participation in the sale process, including by "deliberately craft[ing] a false record of the [Transaction] process both in the 14D-9 and in Board meeting minutes." *Id*. ¶¶ 167–72.

- Count III asserts that Denner breached his fiduciary duties by engaging in insider trading. *Id*. ¶¶ 173–80.

- Count IV asserts that Sarissa aided and abetted Denner's breaches of his fiduciary duties by knowingly participating in the breaches. *Id*. ¶¶ 181–83.

On March 17, 2021, the defendants moved to dismiss the complaint under Rule 12(b)(6). Dkts. 23, 26. This decision addresses the motions to dismiss Counts I and II. The court will issue a separate decision addressing the motions to dismiss Counts III and IV.

37

## II.    THE MOTION TO DISMISS STANDARD

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering a motion under Rule 12(b)(6), the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 537. "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'" *Id.* at 537 n.13. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.* at 535.

## III.    THE SALE PROCESS CLAIMS

In the Sale Process Claims, the plaintiff asserts that enhanced scrutiny applies to the Transaction and that the sale process was not reasonable. The plaintiff contends that the Director Defendants sold the Company too quickly after the Spinoff, at a price far below

its standalone value, and at a time when the Company could not approach any potential acquirers who had contacted Biogen about a transaction before the Spinoff.

In the plaintiff's eyes, Denner was the ringleader. The plaintiff depicts Denner as an Icahn disciple who profits by putting companies into play. According to the plaintiff, Denner uses his hedge fund to target a public company, then pressures the company into adding him to its board of directors. Once on the board, Denner brings on additional friendly directors who will support his aims, then engineers a sale and pockets the profits. In this case, Denner sought to supercharge his gains by causing Sarissa to buy shares based on inside information that Sanofi was interested in buying the Company at a substantial premium. To avoid having to disgorge those gains as short-swing profits, Denner initially held off Sanofi and failed to disclose Sanofi's overtures to the Board. Then, as the end of six-month disgorgement period neared, Denner changed direction and pushed for a quick sale. So as to not waive a red flag that might spook the Board, Denner concealed Sarissa's purchases of stock, but that did not change the general willingness of his boardroom allies to support his push for a near-term sale. The plaintiff alleges that this constellation of facts supports a reasonable inference that the Board employed a sale process that fell outside the range of reasonableness for purposes of enhanced scrutiny.

Viewed against this backdrop, the plaintiff asserts that the pled facts support a reasonable inference that the Director Defendants breached their duty of loyalty. The plaintiff contends that it is relatively easy to infer that Denner acted in bad faith throughout the sale process, including by violating the Company's insider trading policy, concealing

39

Sarissa's purchases of Company stock, withholding material information from the Board about his interactions with Sanofi, and steering the Company into a near-term sale.

The plaintiff maintains that the pled facts support reasonable inferences that other Director Defendants also acted disloyally. The plaintiff argues that Cox's substantial severance package rendered him interested in the Transaction and happy to go along with a near-term sale. The plaintiff depicts the other directors as Denner's confederates. Posner is a fellow Icahn disciple who acted in bad faith by hiding his early interactions with Sanofi from the Board. Protopapas, Germano and Paglia lacked independence from Denner because they want to be repeat players in his company-flipping business model.

The plaintiff asserts claims against Cox in his capacity as CEO and against the other Officer Defendants. The plaintiff asserts that the Officer Defendants breached their fiduciary duties by assisting the Director Defendants in achieving the quick sale to Sanofi as part of a defective sale process. The plaintiff alleges that Cox and Greene breached their fiduciary duties as officers by preparing the Fairness Projections to justify a sale price that they knew undervalued the Company. The plaintiff contends that DiFabio breached her fiduciary duties by embellishing the minutes of the January 4 Board Meeting to depict an idealized process rather than what actually occurred. They assert that DiFabio also breached her fiduciary duties by participating in the drafting of an inaccurate Schedule 14D-9.

The defendants argue that the plaintiff's claims for breach of fiduciary duty must be dismissed under *Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2015), because holders of a majority of disinterested shares approved the Transaction by tendering

a majority of their shares in a fully informed, uncoerced expression of approval. The Director Defendants argue that even if *Corwin* does not apply, then the claims against them must be dismissed because the Company's certificate of incorporation contains an exculpatory provision and the plaintiff has failed to plead non-exculpated claims against them. The Officer Defendants argue that the plaintiff has failed to plead cognizable claims against them of any sort.

This decision starts by analyzing whether *Corwin* applies to cleanse the Transaction and defeat the plaintiff's claims. Because the complaint pleads facts which make it reasonably conceivable that the stockholders' expression of approval was not fully informed, the *Corwin* doctrine does not cleanse the transaction.

This decision next evaluates the sale process under enhanced scrutiny. Tellingly, the defendants do not dispute that enhanced scrutiny applies, and they do not argue that the sale process was reasonable. They thus concede for purposes of the motions to dismiss that the sale process fell outside the range of reasonableness. It is nevertheless useful to parse the plaintiff's core claim because it provides the backdrop to the next issue, which is whether the complaint pleads non-exculpated claims against the Director Defendants and viable claims against the Officer Defendants.

## A.    *Corwin* Cleansing

As part of a multi-pronged response to an explosion of non-meritorious challenges to third-party transactions, the Delaware Supreme Court held in *Corwin* that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies." *Id.*

41

at 309. Moreover, the version of the business judgment rule that applies post-*Corwin* cannot be rebutted based on director-level conflicts that were disclosed to stockholders. *Id.* at 312–13; *see In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *2 (Del. Ch. Aug. 31, 2020) (positing that "[a] hypothetical bribe, if fully disclosed to the stockholders in way of a non-coercive vote, and in the (unlikely) scenario that the stockholders nonetheless approved the transaction, theoretically would result in dismissal under *Corwin* despite adequate pleading of a clear breach of loyalty on the part of the directors"), *aff'd sub nom. Anderson v. Leer*, 265 A.2d 995 (Del. 2021) (TABLE).

Theoretically, a stockholder plaintiff might still assert a claim for waste. However, as the Delaware Supreme Court has explained, "the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful." *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016). The practical effect of *Corwin* cleansing is that when the doctrine applies, a lawsuit that challenges a transaction as a breach of fiduciary duty is subject to dismissal at the pleading stage. *USG*, 2020 WL 5126671, at *1.

The Delaware Supreme Court explained the concept of *Corwin* cleansing in a decision that involved a formal vote on a merger. *Corwin*, 125 A.3d at 306. Cases subsequently extended the doctrine to the expression of approval that results from holders of a majority of shares tendering their stock in a non-coercive tender offer that serves as the first step of either a traditional two-step transaction or, more recently, a medium-form merger under Section 251(h) of the DGCL. *See, e.g.*, *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016) (concluding "that stockholder approval of a merger

42

under Section 251(h) by accepting a tender offer has the same cleansing effect as a vote in favor of that merger"), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE); *Larkin v. Shah*, 2016 WL 4485447, at *20 (Del. Ch. Aug. 25, 2016) (applying *Corwin* to completed first-step tender offer).

Among other limitations, *Corwin* cleansing applies only when the approval by disinterested stockholders is "fully informed." *Corwin*, 125 A.3d at 308–09. "[I]f troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked." *Id.* at 312. Stockholder approval is fully informed when the corporation's disclosures "apprised stockholders of all material information and did not materially mislead them." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" when deciding whether to express approval. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The test does not require "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote," *id.* (cleaned up), or not tender the investor's shares. Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (cleaned up).

To defeat *Corwin* cleansing, a plaintiff only needs to plead the existence of one disclosure violation. *In re Mindbody, Inc.*, 2020 WL 5870084, at *26 (Del. Ch. Oct. 2, 2020) ("One sufficiently alleged disclosure deficiency will defeat a motion to dismiss

43

under *Corwin*."). The defendants ultimately bear "the burden of demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction." *Volcano*, 143 A.3d at 748. At the pleading stage, however, it is "sensible that a plaintiff challenging the decision . . . first identify a deficiency in the operative disclosure document." *Solera*, 2017 WL 57839, at *8. At that point, "the burden [falls] to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote." *Id.*

At the pleading stage, the operative question is whether the complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison*, 191 A.3d at 282. The resulting inquiry necessarily is "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law." *Chester Cnty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

### 1. Denner's And Posner's Interactions With Sanofi And Lazard

The plaintiff argues that the description of Denner's and Posner's interactions with Sanofi and Lazard is inaccurate, misleading, or at the very least incomplete. Under the Rule 12(b)(6) standard, the plaintiff has pointed to sufficient flaws in the disclosures about Denner's and Posner's interactions with Sanofi and Lazard to prevent *Corwin* cleansing from protecting the Transaction.

First, the plaintiff argues that the Schedule 14D-9 was deficient because it did not disclose the date of Denner's initial meeting with Lazard, which took place on May 8,

44

2017. The Schedule 14D-9 stated vaguely that Lazard first reached out to Denner "[i]n May 2017." 14D-9 at 18. While the omission of a single date might seem innocent, its absence here is conspicuous because the Schedule 14D-9 included a specific date when describing every other interaction between the Company and Sanofi. The omission of the date is made more suspicious because the Schedule 14D-9 did not disclose that the Board held a meeting three days later, on May 11. The complaint adequately alleges that by omitting the precise date of Lazard's initial outreach, as well as any mention of the May 11 Board meeting, the Schedule 14D-9 obscures the fact that Denner did not inform the Board of Lazard's outreach. If this date was the only fact omitted about Denner's communications with the Lazard, it might be immaterial. But based on the allegations of the complaint, this omission appears to be the first of a series of incomplete or inaccurate disclosures about Denner's discussions with Sanofi.

Second, the plaintiff alleges that the Schedule 14D-9 inaccurately described the meeting on May 19, 2017, between Sanofi, Posner and Denner because it did not mention that Sanofi made an offer to acquire Company at a price "in the range of $90 per share." It is reasonably conceivable that the price that Sanofi offered at this meeting was material information that the Schedule 14D-9 omitted. *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at \*33–34 (Del. Ch. Oct. 16, 2018) (finding the failure to disclose a price discussed at a dinner during the sale process was a material omission), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE).

Even if Sanofi's price was not material in its own right, the Schedule 14D-9 provided a partial description of the meeting that gives rise to a disclosure problem.

45

Directors have an obligation to provide an accurate, full, and fair description of significant meetings or other interactions between target management and a bidder.[5] The Schedule 14D-9 disclosed the existence of the meeting and described Sanofi's statement that it was only interested in a "friendly transaction." 14D-9 at 18. Having gone that far down the road of partial disclosure, the defendants had a duty to identify the price that Sanofi indicated that it would pay.

The defendants argue that Sanofi's Schedule TO mentioned the price offered at the May 19 meeting, making it irrelevant that the Company's Schedule 14D-9 did not.

---

[5] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280–82 (Del. 1994) (reversing a grant of summary judgment in favor of defendants on disclosure claim where proxy failed to disclose the existence of a bid because "once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events," including the existence of the bid); *Firefighters' Pension Sys. of Kan. City v. Presidio, Inc.*, 251 A.3d 251, 261 (Del. Ch. 2021) ("It is reasonably conceivable that the existence of the tip was material information that should have been disclosed to the stockholders. The Proxy made no mention of LionTree's tip to BCP."); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (holding that plaintiff adequately pled a claim for breach of the duty of disclosure where stockholders appeared to lack information about private communications between CEO and bidders); *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *12 (Del. Ch. Oct. 12, 2016) ("[O]ur Supreme Court recognized that a partial and incomplete disclosure of arguably immaterial information regarding the history of negotiations leading to a merger might result in a materially misleading disclosure if not supplemented with information that would allow the stockholders to draw the complete picture."); *Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (holding that negotiations between buyer's and target's CEO were material when the parties discussed "significant terms" including "valuation"); *see also PLX*, 2018 WL 5018535, at *33–34 (finding after trial that recommendation statement omitted material information where it failed to disclose a communication between a director and a potential bidder about the bidder's interest in acquiring the company and the likely timeframe for a bid).

Depending on the circumstances, Delaware courts may agree that material information has been adequately disclosed as part of the total mix of information.[6] But for purposes of *Corwin* cleansing, when the issue is something as important as a meeting where the target and the bidder discussed the transaction price, a stockholder should be able to rely on the company's disclosures for an accurate, full, and fair characterization of the meeting. It is reasonably conceivable that the Schedule 14D-9's failure to identify the price was a material omission.

Third, the plaintiff argues that the Schedule 14D-9 inaccurately asserted that Posner "updated each member of our Board of Directors regarding the substance" of the May 19 meeting. Compl. ¶ 92; 14D-9 at 18. There is no mention of the May 19 meeting with Sanofi in any minutes or other documents produced in the Section 220 Action. A lack of disclosure to the Board is also consistent with Denner's successful efforts to keep secret Sarissa's illicit purchases of Company common stock. At this stage, the plaintiff is entitled to the inference that Posner did not tell the Board anything about the May 19 meeting.

Fourth, the plaintiff alleges that the Schedule 14D-9 provided an inaccurate description of Posner's call with Weinberg on May 23, 2017. The Schedule 14D-9 stated:

> On May 23, 2017, Mr. Posner called Mr. Weinberg, confirming that the Company was focused on executing its current business objectives and

---

[6] *See Zalmanoff v. Hardy*, 2018 WL 5994762, at *5–6 (Del. Ch. Nov. 13, 2018) (dismissing disclosure claims where information was provided in a Form 10-K along with the proxy), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE); *Wolf v. Assaf*, 1998 WL 326662, at *1 (Del. Ch. June 16, 1998) (finding disclosure in "the proxy mailing rather than in the proxy statement itself adequately inform[ed] the shareholder of the material information as a matter of law").

growing its operations as a standalone business and was not for sale. During that call, Mr. Weinberg acknowledged that he understood and, that from Sanofi's perspective, the matter was now closed. Following the May 23, 2017 call, Mr. Posner sent an email to each member of our Board of Directors with an update on the substance of the May 23, 2017 call, and confirming that Mr. Weinberg informed him that the matter was now closed.

14D-9 at 18. The plaintiff argues that by framing the initial discussions as ending in May 2017, the Schedule 14D-9 attempted to cover up Denner's insider trading. The plaintiff also argues that, contrary to the disclosure, it is reasonable to infer that Sanofi did not believe the matter was closed, because Sanofi continued to pursue the Company through outreach in June, September, and October, and Sanofi's offer letter in November 2017 indicated that during those discussions, Sanofi and Posner talked about a potential deal. Denner's decision to cause Sarissa to buy more than a million shares further supports the inference that the negotiations were far from over in May 2017. The plaintiff also points out that the Section 220 Documents did not contain an email or any other document suggesting that Posner updated the Board about the substance of the May 23 call, including the alleged fact that Sanofi believed the matter was closed after the call. At this stage of the proceedings, the plaintiff is entitled to the inference that such a communication does not exist.[7] Taken as a whole, the plaintiff's allegations support an inference that the description of the meeting on May 23 was inaccurate and incomplete.

_____

[7] To avoid the inference that emails about the May 23 meeting do not exist, the defendants protest that they only produced Cox's emails as part of a negotiated resolution of the Section 220 Action. They also say that they did not yet know what the plaintiff's complaint would assert. Dkt. 33 at 10 n.4. Those arguments are unpersuasive. According to the Schedule 14D-9, Posner sent an email to every director. Cox is a director. If the email existed, then Cox should have had it, and it should have been produced as part of the

Fifth, the plaintiff argues that the Schedule 14D-9 failed to disclose Denner's discussion with Lazard regarding a potential transaction on June 13, 2017. A reasonable stockholder would have found this meeting important, particularly since the Schedule 14D-9 represented that Sanofi considered the negotiations closed as of May 23, 2017. The defendants again rely on Sanofi's disclosures in the Schedule TO to fulfill their own disclosure obligations in the Schedule 14D-9. The defendants must fulfill their own disclosure duties. They cannot rely on the bidder to do it for them. Moreover, the Schedule TO only disclosed that "a representative of the Company" met with Lazard. It did not identify Denner. Relatedly, the plaintiff notes that the Schedule 14D-9 did not disclose that the Board held a meeting two weeks later on June 30. Based on the minutes from that meeting, the plaintiff argues that Denner again failed to disclose his interactions with Sanofi to the Board. Based on this combination of allegations, it is reasonable to infer that Denner's June 13 discussion with Lazard was material and that the Schedule 14D-9 should have described the interaction.

Sixth, the plaintiff alleges that the Schedule 14D-9 gave an inaccurate description of Posner's conversation with the Board on September 13, 2017. Compl. ¶¶ 101–02.

Section 220 Documents. It is also not credible that the defendants did not anticipate that the plaintiff would try to call into question the disclosures in the Schedule 14D-9. The defendants are represented by qualified and experienced counsel. It does not require the divination skills of Professor Trelawney to foresee that a stockholder plaintiff would check a Section 220 production to see if it contained a document referenced in the Schedule 14D-9. Finally, this is not an issue that needs to be fought out at the pleading stage. If the email exists, then the defendants can produce it, and the debate over whether Posner reported to the Board should drop out of the case.

49

According to the Schedule 14D-9, Posner reported a call from Sanofi on September 12 during a regularly scheduled meeting of the Board on September 13. 14D-9 at 18. According to the Schedule 14D-9, the Board discussed that "the Company was not for sale" and "authorized Mr. Posner to schedule a telephonic discussion with Mr. Weinberg and to report back to [the] Board." *Id.* The meeting minutes do not reflect any of this. *See* Compl. ¶ 101; Ex. 28. It is also strange that the Board would have decided that the Company was not for sale on September 13, only to reverse course six weeks later. At the pleading stage, it is reasonable to infer that the disclosure in the Schedule 14D-9 was inaccurate. At a later stage of the case, the record may show that the Schedule 14D-9 described matters accurately, but on a motion to dismiss, the plaintiff is entitled to a favorable inference.

Finally, the plaintiff argues that according to the Schedule 14D-9, Posner spoke to Weinberg on September 15 and informed him the Company was not for sale and was not interested in pursuing a transaction. The description of that conversation does not square with the fact that Sanofi made an offer to buy the Company just a few weeks later. At the pleading stage, the plaintiff is entitled to the inference that this disclosure was inaccurate. The Schedule 14D-9 further stated that Posner "provided a further update to [the Board] regarding the substance of the conversation" on September 15. 14D-9 at 18. Once again, however, there were no minutes or other documents produced in the Section 220 Action that would corroborate an update. Compl. ¶ 102. At the pleading stage, the plaintiff is entitled to the inference that the disclosures were inaccurate.

In response to these omissions and inaccuracies, the defendants argue that as a general matter, the Company was not required to disclose the early contacts with Sanofi

50

and Lazard or Posner's discussions with the Board because there is no obligation to disclose a cumulative "play-by-play" description of events leading to the Transaction. Dkt. 24 at 27–29; Dkt. 33 at 12. It is true that Delaware law does not require a play-by-play, blow-by-blow description, but that general rule must be applied in context. The cases that the defendants cite did not involve failures to disclose meetings with the eventual acquirer where a potential transaction was discussed, failures to disclose price discussions, or inferably inaccurate descriptions of board-level discussions about a potential transaction.[8] The cases also did not involve partial disclosures. Here, the early meetings were material in their own right. In any event, "once the defendants traveled down the road of partial disclosure of the history leading up to the Merger …, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold*, 650 A.2d at 1280; *accord Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996).

Taken together, the complaint's allegations reflect a pattern of omissions and inaccuracies designed to obscure the fact that Denner and Posner were engaging in discussions with Sanofi and Lazard without the Board's knowledge or approval. At the pleading stage, those allegations support an inference that the Schedule 14D-9 did not provide the Company's stockholders with all material information reasonably available, rendering *Corwin* inapplicable.

---

[8] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014); *Globis P'rs, L.P. v. Plumtree Software, Inc*., 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007).

51

## 2. Sarissa's Stock Purchases

The plaintiff separately argues that the Schedule 14D-9 was materially misleading because it failed to disclose that Denner caused Sarissa to purchase over one million shares of stock immediately after Sanofi approached him with an offer in the range of $90 per share. Under Delaware law, stockholders are "entitled to know that certain of their fiduciaries have a self-interest that is arguably in conflict with their own." *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987). "Facts that shed light on the depth of a lead negotiator's commitment to the acquirer and personal economic incentives are generally deemed material to a reasonable stockholder." *Mindbody*, 2020 WL 5870084, at *27. While serving on this court, Chief Justice Strine explained that

> a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.

*In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007). Other precedents support the materiality of information that sheds light on the financial incentives and motivations of directors who are involved in negotiating the deal. *See, e.g.*, *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *34 n.11 (Del. Ch. Mar. 1, 2021) (collecting authorities).

Here, Denner played a central role in the Transaction. He interacted with Sanofi and Lazard in May and June 2017. He asked Sanofi to make an offer in October 2017. He attended the management presentation with Sanofi in December 2017. And he negotiated

52

directly with Lazard and Sanofi over the final price of $105 per share. Information about Denner's interests and motivations was plainly material.

The Schedule 14D-9 did not disclose that Denner caused Sarissa to purchase over one million shares of stock in the Company after Sanofi's indication of interest. A reasonable stockholder would have found it material that Denner sought to profit from non-public information about Sanofi's interest in a transaction. With that information, Denner no longer looks like a fiduciary attempting in good faith to obtain the best outcome possible. He looks like a self-dealing agent engaged in what Tammany Hall philosopher George Washington Plunkitt called "honest graft."[9] Having caused Sarissa to buy shares based on inside information, Denner wanted to achieve a quick sale and bank his profits.

The defendants argue that Denner adequately disclosed Sarissa's stock purchases. They point to the disclosure of Sarissa's total stock ownership in the Schedule 14D-9, but that disclosure does not help the defendants. It is the timing of Sarissa's purchases that makes the ownership problematic, and the disclosure of Sarissa's total stock ownership does not provide any insight into the timing of the purchases.

---

[9] Plunkitt explained how members of Tammany Hall used their advance knowledge of city projects to buy land or sell materials. For example, a member of the Tammany machine might learn that the city was planning to purchase a particular property. Without disclosing the city's interest, the member of the machine would buy the property at the market price, then resell the property to the city at a higher price. William L. Riordon, *Plunkitt of Tammany Hall* 3–6 (2015). Plunkitt viewed that transaction as "honest graft." As he put it, "I seen my opportunities and I took 'em." *Id.* at 3 (cleaned up). Plunkitt distinguished "honest graft" from dishonest graft, which involved bribery, blackmail, or other criminal acts. *Id.* at 6.

The defendants also cite two SEC Form 4s, but they are not enough either. "[O]ur law does not impose a duty on stockholders to rummage through a company's prior public filings to obtain information that might be material to a request for stockholder action." *Zalmanoff*, 2018 WL 5994762, at *5. Rather, stockholders are entitled to receive material information bearing on conflicts of interest in a "clear and transparent manner." *Vento v. Curry*, 2017 WL 1076725, at *4 (Del. Ch. Mar. 22, 2017). The stock purchases were sufficiently significant that the Schedule 14D-9 needed to describe them and explain that they occurred almost immediately after Denner learned about Sanofi's initial offer. As already discussed, the Schedule 14D-9 did not even refer to Sanofi's original price indication.

The defendants complain that disclosing what Denner did would require them to engage in self-flagellation. *See Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992). Hardly. The defendants had an obligation to disclose what Denner and Sarissa did. They needed to disclose the nature of Sanofi's outreach, the price indication, and the timing and details of Sarissa's purchases. They did not have to characterize the purchases as "illicit," as "insider trading," or even as "honest graft." Requiring the defendants to put labels of that sort on Denner's conduct would constitute self-flagellation. Disclosing the facts does not.

The complaint supports a reasonable inference that the Schedule 14D-9 did not provide the Company's stockholders with material information about Sarissa's stock purchases. Again, *Corwin* is inapplicable.

### 3. The Description Of The Tax Matters Agreement

The plaintiff next argues that the Schedule 14D-9 provided a materially misleading description of the Tax Matters Agreement and its relationship to the sale process. *See* 14D-9 at 16–20. The practical effect of the Tax Matters Agreement was to prevent the Company from engaging credibly with any potential buyer that had discussed an acquisition of the Company with Biogen before the Spinoff.

The Schedule 14D-9 discussed the Tax Matters Agreement, but it did not discuss the implications for the sale process. The Schedule 14D-9 stated that the Company

> would potentially be required to indemnify Biogen against taxes incurred by Biogen that arise as a result of our taking or failing to take, as the case may be, certain actions that result in the distribution failing to meet the requirements of a tax-free distribution under Section 355 of the Internal Revenue Code of 1986, as amended (including as a result of the [Transaction]).

14D-9 at 16. That description referred vaguely to "certain actions." It did not identify a sale of the Company or explain the limitations on the Company's ability to engage with a subset of the universe of potential acquirers.

To piece together the effects of the Tax Matters Agreement, a stockholder would have needed to track down the agreement itself, which was not attached to the Schedule 14D-9. *See* 14D-9 at 16. Next, the stockholder would have had to locate Treasury Regulation 1.355-7(b), which the Schedule 14D-9 and the Tax Matters Agreement did not cite. Then, the stockholder would have needed to parse Treasury Regulation 1.355-7(b) to learn that the Company's obligations under the Tax Matters Agreement would be triggered if the Company was acquired by an entity that Biogen had engaged in "substantial

55

negotiations" with regarding a sale of the Company before the Spinoff. 26 C.F.R. § 1.355-7(b).

Disclosures are not supposed to send stockholders on a scavenger hunt.[10] To assume that a stockholder could assemble this information "would create a 'super' shareholder standard and create almost limitless opportunities for deception of the 'reasonable' shareholder." *Marshall*, 832 A.2d at 1262.

The plaintiff also complains that the Schedule 14D-9 did not list the potential acquirers with whom the Company believed it could not credibly engage. For years, Denner and Posner had been pushing, in their capacity as Biogen directors, for Biogen either to sell the Company outright to a large pharmaceutical company or to spin it off as an independent entity. *See* Compl. ¶¶ 2, 15. It is reasonably conceivable that before the Spinoff, Biogen would have discussed a sale of the Company with the *most likely* buyers of the Company. It is reasonably conceivable that Denner and Posner would have known about those buyers.

---

[10] *Ark. Tchr. Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *24 (Del. Ch. June 28, 2019); *see ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003) (holding plaintiff showed reasonable probability of success on disclosure claim because "the portions of [the undisclosed agreements] relevant to a reasonable shareholder are neither highlighted nor mentioned directly" and noting that "it is incredible to suggest that a reasonable shareholder would identify" the relevant provisions as important when the disclosure did not mention them); *cf. In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *10 (Del. Ch. July 24, 2014) ("Discovering the alleged harm would have required a careful and close reading of multiple SEC filings and incorporated exhibits by a stockholder strongly suspicious of the Board's disclosures. The Court cannot say, at the pleading stage, that such effort is required of a reasonably diligent stockholder for laches purposes.").

Ordinarily, a disclosure document does not identify the parties that a company does not contact. A disclosure document, however, usually does provide some indication of the scope of the company's efforts. Delaware law also requires that a company identify material restrictions on bidders, such as the existence of don't-ask-don't-waive standstills. *See Columbia Pipeline*, 2021 WL 772562, at *33 (holding failure to disclose that multiple potential acquirers were precluded from bidding by "don't ask, don't waive" provisions in standstill agreements was material, and collecting authorities). At the pleading stage, and under the facts alleged, it is reasonable to infer that the Schedule 14D-9 needed to provide some discussion of acquirers with whom the Company could not engage because of the Tax Matters Agreement.

It is also reasonable to infer that a stockholder would want to know that the Board negotiated the Transaction under suboptimal conditions and that those conditions would expire just one year after the Board voted to approve the Transaction. A stockholder would view it as important that the Board decided not to wait until the restrictions lifted and instead elected to move forward with Sanofi at a time when it is reasonable to infer that at least some other bidders could not compete.

The discussion of the Tax Matters Agreement in the Schedule 14D-9 was materially misleading. Once again, *Corwin* does not apply.

4. **Disclosures Regarding The November LRP And The Fairness Projections**

The plaintiff next contends that the Schedule 14D-9 should have disclosed (i) the projections in the November LRP, (ii) the changes to the November LRP projections that

57

the defendants made to create the Fairness Projections, and (iii) the valuations presented to the Board based on the November LRP. The defendants respond that the Schedule 14D-9 disclosed (i) the existence of the November LRP, (ii) the existence of a valuation based on the November LRP, and (iii) a summary of the Fairness Projections. They say no more was required.

Delaware law regarding the disclosure of projections starts from the proposition that "[i]n the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate." *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006). Projections must be "reliable" to merit disclosure. *Id.* at *16. That standard does not mean that directors need to disclose the single set of projections that they deem most reliable. The standard also does not mean that the directors only need to disclose the final projections that the financial advisors rely on in their fairness opinions or that the board elects to use when approving the transaction. To the contrary, circumstances may dictate that other sets of projections, including interim projections, are sufficiently reliable to require disclosure.[11] There is also no rule that

_____

[11] *See KCG*, 2019 WL 2564093, at *14 ("Thus, under *PNB*, if the circumstances surrounding the preparation of interim projections reveal them to be reliable enough to aid stockholders in making an informed judgment, they should be disclosed, regardless of whether they were the final projections relied upon by the Board."); *see also See Chen v. Howard-Anderson*, 87 A.3d 648, 687–89 (Del. Ch. 2014) (declining to hold at the summary judgment stage that defendants' failure to disclose a set of projections, which were not the final projections relied on by the board and its financial advisor, was immaterial as a matter of law where the facts supported an inference of reliability); *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *21 (Del. Ch. Nov. 30, 2020) (finding omitted set of projections that included a substantial acquisition plan was material and reliable at the pleading stage where "the Company historically engaged in a consistent practice of

interim projections are only reliable if they were prepared in the ordinary course of business or explicitly adopted as reliable by a board. Instead, for projections to be material, the circumstances surrounding their preparation must "support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment." *PNB*, 2006 WL 2403999, at *16.

The plaintiff has pled facts making it reasonably conceivable that the earlier, more optimistic November LRP was "in fact reliable and thus material." *KCG*, 2019 WL 2564093, at *14. According to the complaint, the November LRP contained "detailed, carefully prepared bottoms-up projections developed by management and presented to the Board" that "were the only projections the Board had when it purportedly made the $105 per share counteroffer." Compl. ¶ 145. Company management made certain upward modifications to the November LRP after discussions with the Board. *Id.* ¶¶ 122, 129. Guggenheim used the November LRP to create a valuation of the Company at $150.21 per share, which was presented to the Board on November 21, 2017. *Id.* ¶ 116. JP Morgan used the November LRP to generate a valuation of the Company at $158.16 per share, which was shared with the Board on January 3, 2018. *Id.* ¶ 129. Accepting those allegations as

growth through acquisitions," the board "considered whether to pursue its acquisition strategy as a standalone entity" during the sale process, and the omitted projections were "presented to the Board during the [sale] process"). *See generally* Blake Rohrbacher & John Mark Zeberkiewicz, *Fair Summary: Delaware's Framework for Disclosing Fairness Opinions*, 63 Bus. Law. 881, 889 (2008) (explaining that "otherwise-reliable management projections completed shortly before a merger or other transaction will generally be regarded as material").

true, it is reasonably conceivable that the projections in the November LRP were material and should have been disclosed. *See KCG*, 2019 WL 2564093, at *14.[12]

It is also reasonable to infer that the Schedule 14D-9 should have disclosed the changes to the November LRP that resulted in the Fairness Projections. "[I]f the circumstances surrounding the preparation of final projections relied upon by the Board and disclosed to stockholder[s] cast doubt on their reliability, then those circumstances should be disclosed." *KCG*, 2019 WL 2564093, at *14. The plaintiff alleges Company management created the Fairness Projections at the last-minute: two weeks after the Board countered at and Sanofi agreed to a price of $105 per share, and just four days before the Board formally approved the Transaction. *See* Compl. ¶¶ 131, 138–41. The plaintiff further alleges that the Fairness Projections were significantly more pessimistic than the November LRP and reduced the Company's internal estimate of standalone value by one third, bringing the valuation just below the Transaction price. Based on these allegations, it is reasonable to infer that the Schedule 14D-9 should have provided a description of both sets of projections so that a "stockholder could readily track the changes and reasonably infer the rationale that went into the changes from one scenario to another." *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *9 (Del. Ch. Mar. 31, 2017).

---

[12] To cast doubt on the November LRP's reliability, the defendants assert that the November LRP "departed sharply from the September LRP used to operate the business." Dkt. 24 at 31. The difference between the two projections may ultimately undercut the reliability of the November LRP. At the pleading stage, however, the plaintiff is entitled to the inference that the projections in the November LRP were reliable.

This decision is not holding that directors always have to a duty disclose every set of projections and describe the changes that mark each iteration. The duty of disclosure depends on the facts and circumstances. That is true under federal law, which provides significant guidance through a rules-based regime, yet where the assessment of materiality nevertheless "requires delicate assessments of the information a 'reasonable shareholder' would draw from a given set of facts." *TSC Indus.*, 426 U.S. at 450. That is all the more true under Delaware law, which uses the same standard of materiality, and where courts make case-by-case determinations about what information is material on the facts presented. The plaintiff has alleged facts that provide (i) reason to think the November LRP was reliable, (ii) reason to doubt the reliability of the Fairness Projections, and (iii) reason to believe that the changes made to the November LRP to generate the Fairness Projections would be "material[ ] to the electorate" when deciding "whether accepting the [Transaction] price [was] a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company." *PNB*, 2006 WL 2403999, at *15–16.

The pled facts also make it reasonably conceivable that the valuation presented to the Board at the November 21 meeting based on the November LRP was material and should have been disclosed. The allegations of the complaint resemble the facts of *PLX*, a post-trial decision which analyzed whether a valuation that was mentioned in the proxy, but not disclosed, constituted a misleading partial disclosure. The court explained that

> [e]ven if the information was not independently material, once the
> Recommendation Statement discussed the May 24 valuation, stockholders
> were entitled to know the range it produced, particularly when it was one of

61

only two valuations that the directors possessed when they negotiated the price of the deal and when both the counteroffer and the final deal price fell below the valuation range.

*PLX*, 2018 WL 5018535, at \*38. As in *PLX*, the Schedule 14D-9 referred generally to the November valuation,[13] which was one of only two valuations that the Board possessed when they negotiated the price of the Transaction. *See PLX*, 2018 WL 5018535, at \*38. And in *PLX*, the counteroffer and final deal price of $105 per share fell far below Guggenheim's valuation of $150.21 per share.

In *PLX*, the plaintiffs proved at trial that the omitted valuation was material. The current case is still at the pleading stage. The evidence at a later stage may show that the November valuation was not material. On the pleadings, however, the plaintiff is entitled to an inference that the Schedule 14D-9 made a materially misleading partial disclosure by omitting it.

*Corwin* cleansing is again unavailable.

**B.     The Applicable Standard Of Review**

In the absence of *Corwin* cleansing, the court must evaluate whether the complaint's allegations state a claim for breach of fiduciary duty. The starting point is to determine the correct standard of review. *See Chen*, 87 A.3d at 666. Delaware corporate law has three

---

[13] 14D-9 at 20 ("During [the November 21] meeting, representatives of J.P. Morgan and Guggenheim Securities made a joint presentation with respect to Sanofi's non-binding November 3 Proposal and discussed with [the] Board of Directors certain financial and market information, including *a preliminary illustrative valuation analysis regarding the Company*." (emphasis added)).

tiers of review: the business judgment rule, enhanced scrutiny, and entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

Delaware's default standard of review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009). The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

"Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 44 (Del. Ch. 2013). Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary III*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself

63

must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which is Delaware's "intermediate standard of review." *Trados II*, 73 A.3d at 43. It governs "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *Id.* Framed generally, enhanced scrutiny requires that defendants "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007).

In *Revlon*, the Delaware Supreme Court applied the intermediate standard of review to the sale of a corporation. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179–82 (Del. 1986). Enhanced scrutiny applies in this setting because "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful." *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012). Put differently,

> [t]he heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.

64

*Dollar Thrifty*, 14 A.3d at 597 (footnote omitted). Consequently, "the predicate question" of the fiduciary's "true motivation" comes into play, and "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced" the fiduciary's decision. *Id.* at 598.

To satisfy enhanced scrutiny in an M & A setting, directors must establish both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision" and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994). "Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty*, 14 A.3d at 598.

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011). The reasonableness standard, however, does not permit a reviewing court to freely substitute its own judgment for the directors' judgment.

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided

65

otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC*, 637 A.2d at 45 (emphasis omitted). Enhanced scrutiny "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005). "[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there." *Dollar Thrifty*, 14 A.3d at 595–96.

The Transaction involved a sale of the Company for cash. Accordingly, enhanced scrutiny applies. *See QVC*, 637 A.2d at 45. The plaintiff thus can state a claim for breach of duty by pleading facts supporting a reasonable inference that the Transaction and the process that led to it fell outside the range of reasonableness. *Id.*

The plaintiff argues that the Transaction is also subject to entire fairness review because a majority of the six-person Board was interested or lacked independence. Because this decision holds that the plaintiff has stated a claim under enhanced scrutiny, the court need not decide if the Transaction is subject to entire fairness review at this stage.

## C. The Claim For Breach Of Fiduciary Duty Under The Enhanced Scrutiny Standard

A court applying enhanced scrutiny asks whether the directors' conduct fell within a range of reasonableness. What typically drives a finding of breach "is evidence of self-interest, undue favoritism or disdain towards a particular bidder, or a similar non-stockholder-motivated influence that calls into question the integrity of the process." *Del*

*Monte*, 25 A.3d at 831. "[W]hen there is a reason to conclude that debatable tactical decisions were motivated not by a principled evaluation of the risks and benefits to the company's stockholders, but by a fiduciary's consideration of his own financial or other personal self-interests, then the core animating principle of *Revlon* is implicated." *El Paso*, 41 A.3d at 439.

"The sins of just one fiduciary can support a viable *Revlon* claim." *Mindbody*, 2020 WL 5870084, at *14. While serving as a member of this court, Chief Justice Strine wrote that "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[ ] tilts the sales process for reasons inimical to the stockholders' desire for the best price." *Toys "R" Us*, 877 A.2d at 1002. Chancellor McCormick has reframed this observation more aptly to state that "the paradigmatic *Revlon* claim involves a *conflicted fiduciary* who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value." *Mindbody*, 2020 WL 5870084, at *13. (emphasis added). Even a non-fiduciary can taint a board process by shaping the informational environment on which the board acts through various types of misconduct that falls under the heading of "fraud on the board."[14]

---

[14] *See*, *e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 865 (Del. 2015) (explaining that trial court's award of money damages against financial advisor "was premised on [the financial advisor]'s 'fraud on the Board'"); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) (describing knowing silence of financial advisor and management about a tip as "a fraud upon the Board"); *Del Monte*, 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled

When viewing the Company's sale process under enhanced scrutiny, it is reasonably conceivable that Denner's conflicts tainted the sale process from the jump and that he steered the Company toward a quick sale to Sanofi to serve his own interests in maximizing his short-term profits from insider trading at the expense of generating greater value through a competitive bidding process or by having the Company remain independent. The complaint supports a reasonable inference that because of Denner's actions, the sale process did not achieve "the best value reasonably available to the stockholders." *QVC*, 637 A.2d at 43.

### 1. Denner's Conflicts

The allegations of the complaint support a reasonable inference that Denner had self-interested reasons to secure a transaction with Sanofi. The plaintiff alleges that Denner faced a conflict because (i) he wanted to achieve a near-term sale as part of his activist playbook and (ii) he sought to lock in quick and massive profits on the shares he caused Sarissa to acquire based on inside information. Compl. ¶¶ 2–3, 165.[15]

---

the board); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1069 (Del. Ch. 2004) (holding that if directors were "purposely duped," then there "was fraud on the board" and the directors' actions were subject to equitable challenge), *aff'd*, 872 A.2d 559 (Del. 2005). *See generally* Joel Edan Friedlander, *Confronting the Problem of Fraud on the Board*, 75 Bus. Law. 1441 (2020).

[15] The plaintiff points out that Denner owned unvested options and RSUs that accelerated in connection with the Transaction, giving him an additional interest that differed from the stockholders as a whole. *Id.* ¶ 165. It seems likely that, for Denner, the acceleration of unvested equity that he otherwise might lose was a secondary consideration. This decision addresses this argument when evaluating the interests of other directors, where it is more salient.

### a. An Interest In A Near Term Sale

The plaintiff alleges that Denner had a divergent interest in a near-term sale that undermined his ability to act as a disinterested and independent fiduciary. As Sarissa's agent and managing member, Denner faced the dual fiduciary problem identified in *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). There, the Delaware Supreme Court held that there was "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations and "no 'safe harbor' for such divided loyalties in Delaware." *Id.* at 710. "If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest."[16] "If the interests of the beneficiaries are aligned, then there is no conflict." *Chen*, 87 A.3d at 670.

---

[16] *Chen*, 87 A.3d at 670; *see, e.g.*, *Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted)); *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflicts of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (explaining for purposes of demand futility that "[d]irectorial interest exists whenever divided loyalties are present" (cleaned up)); *Goldman v. Pogo.com Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, [were] both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan.").

Ordinarily, Sarissa's significant holdings of Company common stock would help undermine any concern about a divergent interest. "Delaware law presumes that investors act to maximize the value of their own investments." *Katell v. Morgan Stanley Gp., Inc.*, 1995 WL 376952, at *12 (Del. Ch. June 15, 1995). "When a large stockholder supports a sales process and receives the same per share consideration as every other stockholder, that is ordinarily evidence of fairness, not of the opposite . . . ." *Iroquois Master Fund Ltd. v. Answers Corp.*, 105 A.3d 989, 2014 WL 7010777, at *1 n.1 (Del. 2014) (TABLE). When directors or their affiliates own "material amounts" of common stock, it generally aligns their interests with other stockholders by giving them a "motivation to seek the highest price" and the "personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so." *PLX*, 2018 WL 5018535, at *41 (cleaned up).

Like any general rule, there are exceptions. Circumstances may cause the interests of a stockholding director to diverge from the interests of other stockholders. For example, "liquidity is one benefit that may lead directors to breach their fiduciary duties, and stockholder directors may be found to have breached their duty of loyalty if a desire to gain liquidity caused them to manipulate the sales process and subordinate the best interests of the corporation and the stockholders as a whole." *Id.* (cleaned up). "For similar reasons, particular types of investors may espouse short-term investment strategies and structure their affairs to benefit economically from those strategies, thereby creating a divergent interest in pursuing short-term performance at the expense of long-term wealth." *Id.* This is particularly true for activist hedge funds, which are "the archetypal short-term investor." Marcel Kahan & Edward B. Rock, *Hedge Funds in Corporate Governance and Corporate*

70

*Control*, 155 U. Pa. L. Rev. 1021, 1083 (2007). Activist hedge funds "are impatient shareholders, who look for value and want it realized in the near or intermediate term. They tell managers how to realize the value and challenge publicly those who resist the advice, using the proxy contest as a threat." *PLX*, 2018 WL 5018535, at *41 (cleaned up). Put simply, hedge funds strive "to generate short-term results." Leo E. Strine, Jr., *Toward Common Sense and Common Ground? Reflections on the Shared Interests of Managers and Labor in a More Rational System of Corporate Governance*, 33 J. Corp. L. 1, 5 (2007).[17]

Denner correctly observes that it is not enough "for a plaintiff simply to argue in the abstract that a particular director has a conflict of interest because she is affiliated with a particular type of institution." *Chen*, 87 A.3d at 671. In other words, it is not enough for the plaintiff to merely plead that Denner is the principal of a hedge fund and claim that he therefore faced a conflict. A director's affiliation with a hedge fund is an important contextual fact, but the question is whether the complaint's allegations make it reasonably conceivable that the director faced a disabling conflict in the specific case.

Here, it is reasonably conceivable that Denner had a disabling conflict. The complaint details the playbook that Denner has followed on multiple occasions. Through

---

[17] *See generally* Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite? A Flesh-And-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1892–910 (2017); Kahan & Rock, *supra*, at 1070–72. *But see* Lucian A. Bebchuk et al., *The Long-Term Effects of Hedge Fund Activism*, 115 Colum. L. Rev. 1085, 1093–96 (2015) (disputing "the myopic-activists claim").

Sarissa, he targets a particular biopharma or healthcare company. He uses a proxy contest or the threat of one to force his way into the boardroom. Once there, he recruits director allies in the form of other Sarissa insiders or supportive repeat players. He then pursues an outcome that facilitates Sarissa's short-term investment horizons, typically through a near-term sale. *See* Compl. ¶ 3; Dkt. 31 at 8–11.

The complaint describes how Denner followed this playbook to achieve a sale of Ariad in February 2017, just three months before Sanofi first reached out to Denner about a sale of the Company.

- In 2013, Denner and Sarissa acquired a stake in Ariad. Compl. ¶ 26.

- In 2014, Denner joined Ariad's board under the terms of a nomination and standstill agreement. *Id.*

- In 2015, Sarissa waged an activist campaign that settled in exchange for Protopapas being added to the Ariad board, and the chairman and CEO agreeing to step down. *Id.* ¶¶ 3, 26.

- In 2016, Ariad decided to undertake a sale process. Ariad formed a "Coordination Committee" to oversee the sale process, and Denner and Protopapas were two of the three directors selected to serve on the committee. *Id.* ¶ 26.

- The sale process ended with the sale of Ariad to Takeda, which was announced on January 9, 2017, and closed on February 15, 2017. *Id.*

Sarissa made a profit of $260 million on its Ariad investment. *Id.* ¶¶ 26, 93.

Lazard served as the investment bank that advised Denner and Ariad's Coordination Committee. *Id.* ¶ 26. It is reasonable to infer that when Lazard approached Denner about Sanofi's interest in acquiring the Company, just three months after the Ariad sale, Denner saw an opportunity to call the same play. But unlike at Ariad, Denner and Sarissa did not yet own a significant amount of Company common stock, so the first thing Denner did was

72

to cause Sarissa to purchase 1,010,000 shares. That purchase violated the Company's insider trading policy, and Denner kept his purchase secret from the Board.

It is also reasonable to infer that Denner took steps to populate the Board with individuals who supported his strategy. When Lazard approached Denner, he already had one ally on the Board. Denner had managed to add Protopapas as a director on February 28, 2017, just two weeks after the sale of Ariad closed. *Id.* ¶¶ 4, 25–26. It is reasonable to infer that after helping Denner obtain a successful sale at Ariad, Protopapas was prepared to run it back. Denner next succeeded in adding Germano to the Board. Before his appointment, Germano was unemployed, and it is reasonable to infer that Germano would support the person who helped him get his next gig.

Denner then took action to achieve a near-term sale. In October 2017, without Board authorization, Denner invited Sanofi to make an offer as part of a single-bidder process. He played a major role as the discussions unfolded, and he personally conducted the final negotiations with Lazard over price. Sarissa made a profit of $49.7 million for its brief investment in the Company.

When a defendant acts in accordance with a known playbook, the plaintiff gets the benefit of an inference at the pleading stage that the defendant is following the playbook. Even at trial, evidence of prior acts is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." D.R.E. 404(b)(2). The defendants may be able to show at a later stage of the case that the evidence of prior acts is unpersuasive and any inference is unjustified, but at the pleading stage, the plaintiff receives the benefit of the inference. In this case, the plaintiff is entitled to a

73

pleading-stage inference that Denner acted in furtherance of a short-term strategy that served the best interests of his hedge fund, Sarissa, rather than the best interests of the Company and its stockholders.

### b. The Stock Purchases

The plaintiff is also entitled to an inference that Denner had an interest in achieving a near-term sale to Sanofi to turn a quick profit on illicitly purchased shares. Days after learning that Sanofi was interested in a potential transaction at a price around $90 per share, Denner caused Sarissa to purchase 1,010,000 shares of Company stock at an average price of $55.74 per share. Before these purchases, Sarissa owned only 155,000 shares of the Company. Compl. ¶¶ 18, 93. At $90 per share, Denner could realize a profit of at least $34.25 per share, or about $35 million.

To defeat the inference that Denner had an incentive to flip the Company after making a massive purchase of stock based on inside information, the defendants make the standard argument that it would have been irrational for Denner to sacrifice value by selling for less than the best price he could get. Dkt. 24 at 41–42; *accord* Dkt. 26 at 18–19; Dkt. 33 at 23–24; Dkt. 35 at 12–13. Relying on extreme language drawn from *In re Synthes, Inc. Stockholder Litigation*, 50 A.3d 1022 (Del. Ch. 2012), the defendants argue that Sarissa's stock purchases could not create any divergent interest because the complaint fails to plead that Sarissa faced "*any* liquidity need—much less a crisis, fire sale, or exigent need [for liquidity]" that would have caused Denner to shortchange himself. Dkt. 24 at 42 (cleaned up). Chancellor McCormick has explained persuasively why the "hyperbolic language" in *Synthes* about a "crisis" or "fire sale" and an "exigent need" for "immediate

74

cash" is best understood as reflecting the court's reaction to a particularly deficient complaint, which was "strikingly devoid of pled facts to support" a liquidity-driven conflict. *Mindbody*, 2020 WL 5870084, at *17 (cleaned up). She noted that by the time of oral argument, the plaintiffs in *Synthes* had "conceded that they did not plead facts supporting" aspects of their liquidity-driven theory. *Id.* (cleaned up). The extreme language in *Synthes* should not be read as establishing a general rule. *Id.*; *accord Presidio*, 251 A.3d at 256. "A complaint instead must allege facts that support a reasonable inference of a divergent interest, regardless of the source, that rises to the level of a disabling conflict." *Presidio*, 251 A.3d at 256.

Like the defendants in *Mindbody*, the defendants here take the simplistic view that an investor will always wait for a higher value later rather than taking a sure thing in the near term. That is just not true. Investors follow different strategies, have different hurdle rates, and enjoy different reinvestment options. Near-term cashflows are more beneficial than outyear cashflows, precisely because they arrive sooner. An investor with attractive reinvestment options can redeploy those cash flows into other investments. An investor's use of leverage also affects the decision. A leveraged financial investor might well seize a near term opportunity so that the profits can be deployed into an investment with a higher return. By the same token, an activist hedge fund may favor a near-term sale, followed by the redeployment of capital into another activist campaign. Yet for the common stockholders in the firm, the sounder choice may be for the firm to remain independent.

The complaint supports a reasonable inference that Denner caused Sarissa to make a significant investment in the Company's common stock based on inside information

75

indicating that the Company soon could be sold. Against that backdrop, the complaint supports a reasonable inference that Denner wanted the Company to be sold and that by shepherding the Company through a quick, non-competitive sale process with Sanofi, Denner could lock-in a sure gain on his illicit stock purchases. It is reasonably conceivable that by pursuing this strategy, Denner acted disloyally because he served his personal interests rather than pursuing the best interests of the Company and its stockholders.

2.      **The Implications Of Denner's Conflicts For The Sale Process**

It is reasonably conceivable that Denner's conflicts tainted the sale process. Determining how to obtain the best transaction reasonably available is a complex task. "The board of directors is the corporate decisionmaking body best equipped to make these judgments." *QVC*, 637 A.2d at 45.

When a director has an undisclosed, material conflict, that fact supports a pleading-stage inference that the process was tainted. *See City of Fort Myers Gen. Emp. Pension Fund v. Haley*, 235 A.3d 702, 719 (Del. 2020); *Technicolor Plenary III*, 663 A.2d at 1168. When undisclosed conflicts of interest exist, even otherwise reasonable choices "must be viewed more skeptically." *El Paso*, 41 A.3d at 434; *accord RBC*, 129 A.3d at 855. "No one can tell what would have happened" if Denner had disclosed his conflicts. *See El Paso*, 41 A.3d at 447. But it is reasonable to infer that the "process would have played out differently." *Del Monte*, 25 A.3d at 833.

As alleged in the complaint, Denner orchestrated a single-bidder sale process that enabled Sarissa to capitalize on its gains from insider trading. When Sanofi approached Denner and Posner with an offer of around $90 per share in May 2017, they allegedly did

76

not report the contact to the Board. Denner instead promptly violated the Company's insider trading policy by causing Sarissa to buy over one million shares of stock based on inside information about Sanofi's interest.

The straight-line path for Denner to profit from his insider trading was to push off a sale until after the six-month period for disgorging short-swing profits had expired, then engineer a sale to Sanofi. Consistent with that timeline, when Sanofi reapproached Denner and Posner in June and September 2017, they temporized. The complaint alleges that neither Denner nor Posner reported these additional overtures to the Board. And in a meeting on September 12, 2017, when the Board reviewed a list of its largest stockholders that did not identify Sarissa, Denner remained silent.

Then, just one month before the end of the short-swing disgorgement period, Sanofi approached Denner again. Now that the time was right, Denner reversed position and embraced the prospect of a sale. Without authorization from the Board, Denner invited Sanofi to make a preemptive bid that could result in a single-bidder process.

Nothing about the Company's trajectory warranted Denner's volte face. If anything, the Company's standalone prospects had continued to improve. At this stage, the plaintiff is entitled to the inference that Denner invited Sanofi to bid in October 2017 because Sarissa could profit from a quick deal.

Denner never disclosed his stock purchases or his early contacts with Sanofi. Keeping the Board in the dark reduced the risk that Denner's illicit stock purchases would attract scrutiny. It also allowed Denner to time the sale process to serve his own self-interests. By not disclosing his actions, Denner prevented the Board from taking steps to

neutralize his conflicts. The Board might well have prevented Denner from playing any further role in the sale process. Instead, Denner became the point person for the Company.

If the Board had known about Denner's actions, they also might well have approached the prospect of a near-term sale with greater skepticism. When directors consider whether to sell a corporation, their fiduciary duties obligate them "to seek the transaction offering the best value reasonably available to the stockholders." *QVC*, 637 A.2d at 43. "The best transaction reasonably available is not always a sale; it may mean remaining independent and not engaging in a transaction at all." *PLX*, 2018 WL 5018535, at *29.

Here, the Company was executing its business plan successfully and exceeding the performance goals set in the 2017 Annual Plan. The Company was expanding its markets, growing its pipeline of drugs, making value-enhancing acquisitions, and entering and exploring significant collaborations with other companies. Compl. ¶¶56–60. The market had not yet figured out how to price the Company, and the stock price did not reflect the Company's true value. Indeed, according to the Schedule 14D-9, no one pursued Sanofi's earlier approaches because the directors were "confident in the future of the Company as a standalone business." 14D-9 at 18–20. Nothing about the Company had changed for the worse since those earlier approaches. If anything, the Company's value had increased, and the projections that the Board approved as part of the 2018 Annual Plan, when extended as part of the November LRP, supported a value in excess of $150 per share. Without Denner leading the charge for a sale, the Board might well have decided not to engage.

The Board also might well have rejected the possibility of a near-term sale because the legal consequences of the Spinoff meant that the Company could not pursue a transaction with a number of logical acquirers. Until February 2019, the Company risked making the tax-free distribution of shares in the Spinoff taxable if the Company was sold to a buyer that had discussed a potential transaction with Biogen before the Spinoff. Under the Tax Matters Agreement, the Company agreed to indemnify Biogen and its stockholders for that massive liability. The Company therefore could not engage credibly with those bidders, either for purposes of a sale or to create competition for Sanofi. Without Denner pushing for a near-term sale, the Board could have concluded that the best course was to wait for another year before exploring strategic alternatives, so that a transaction could close after the Restricted Period had expired.

The plaintiff also contends that the Board's single-bidder process with Sanofi was unreasonable. Conducting a single-bidder process is not unreasonable per se under Delaware law. To the contrary, the Delaware Supreme Court has held that a challenge to a transaction that involved no pre-signing outreach and only a passive, post-signing market check could not support a reasonable likelihood of a breach of duty, explaining that a board may "pursue the transaction it reasonably views as most valuable to stockholders, so long as the transaction is subject to an effective market check under circumstances in which any bidder interested in paying more has a reasonable opportunity to do so." *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014). The high court emphasized that "[s]uch a market check does not have to involve an active solicitation, so long as interested bidders have a fair opportunity to

present a higher-value alternative, and the board has the flexibility to eschew the original transaction and accept the higher-value deal." *Id.* at 1067–68.

That authority does not help the defendants at the pleading stage, because where undisclosed conflicts of interest exist, a decision to pursue a single-bidder process must be viewed more skeptically, and the decision to initiate a single-bidder sale process can fall outside the range of reasonableness. *See, e.g.*, *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 91 (Del. Ch. 2014), *aff'd sub nom. RBC*, 129 A.3d 816. Here, the implications of the post-Spinoff Restrictive Period meant that many logical bidders would not have a fair opportunity to present a higher-value alternative.

The plaintiff is entitled to the inference that it was unreasonable for the Board to negotiate exclusively with Sanofi, a company that made clear it would only engage in a friendly transaction, at a price far below the only evidence of the Company's standalone value. The plaintiff is entitled to the inference that Denner's undisclosed conflicts contributed to the Board following this course and that the sale process would have unfolded differently if Denner had disclosed his conflicts.

In an effort to defeat these inferences, the defendants ask the court to draw contrary inferences in their favor at the pleading stage based on documents outside the record. They ask the court to find credible the reasons that the Director Defendants provided for supporting the Transaction in the Schedule 14D-9. At most, those reasons create a question of fact about why the Board acted, and that issue cannot be resolved on a motion to dismiss.

In evaluating the pleading-stage reasonableness of the Board's decision to pursue a single-bidder process, it bears remembering that Denner was the one who suggested it to

80

Sanofi. Moreover, Denner did so in October 2017, and he acted without the Board's knowledge or authorization. It was not until a month later that the Board allegedly adopted this strategy at the November 25 meeting. It is reasonable to infer that Denner favored the single-bidder process and that his commitment to Sanofi affected the Board's ability to pursue a different course.

It is also reasonably conceivable that Denner's conflicts affected the price negotiations with Sanofi. After Sanofi increased its offer to $101.50 per share in January 2018, Denner led the Board in making a counteroffer at $105 per share. The plaintiff has made allegations, reinforced by evidence, which support a pleading-stage inference that the counteroffer dramatically undervalued the Company:

- On November 21, 2017, Company management provided the November LRP to the Board. Based on the November LRP, Guggenheim valued the Company at $150.21 per share. Compl. ¶ 116.

- On November 25, 2017, the Board authorized Company management to present the November LRP to Sanofi. *Id.* ¶ 118. No downward modifications were made or discussed at this time.

- On December 14, 2017, the Board met for a mock management presentation, which included the November LRP. *Id.* ¶ 121. Again, no downward modifications were made.

- On December 18, 2017, Company management met with Sanofi and presented the November LRP. This version of the November LRP included upward modifications. Following the meeting, Sanofi sent the Company a list of follow up diligence questions relating to the projections. *Id.* ¶¶ 122–23.

- On December 27, 2017, the Company responded to Sanofi's questions with answers consistent with the November LRP and noted "we have been conservative in [the] assumptions." *Id.* ¶ 123.

- On January 3, 2018, Sanofi offered $101.50 per share. That same day, Company management sent the financial advisors an updated model, which JP Morgan used

81

to value the Company at $158.16 per share. Guggenheim sent this model to the Board. *Id.* ¶¶ 127, 129–30.

- On January 4, 2018, despite receiving the updated valuation the night before, the Board decided to counter at $105 per share. *Id.* ¶ 131.

For six weeks, all of the information that flowed to the Board pointed to a valuation over $150 per share. Yet, the Board countered at $105 per share, just 3.4% more than Sanofi's offer and substantially below all of the prior valuation indications.

Denner was at the center of the negotiation process. The Board met to consider Sanofi's offer of $101.50 per share on the same day that Sanofi made it. During a further meeting on January 4, the Board designated Denner as the person who would convey the counter of $105 per share to Lazard. Before Denner could set up the call, Lazard contacted him. Denner stepped out of the meeting and took the call. An exchange ensued in which Sanofi accepted the price of $105 per share conditioned on exclusivity. Denner then rejoined the Board meeting and told the Board they had a deal on price, conditioned on exclusivity. The Board approved the grant of exclusivity, and the deal was struck. It is reasonable to infer that with a different negotiator, or with Denner screened off from the pricing discussions, the negotiations would have gone differently.

In response to the plaintiff's allegations and evidence regarding price, the defendants point out that Sanofi increased its offer twice and that the price of $105 per share reflected a 64% premium over the market price. "*Revlon* requires us to examine whether a board's overall course of action was reasonable," not just the end product. *RBC*, 129 A.3d at 854 (cleaned up). A headline premium is a good starting point, but "the fact of a premium alone" does not mean that a transaction was the best value reasonably

available.[18] The complaint contains well-pled allegations to the effect that the market was not yet fully valuing the Company—and that the defendants themselves believed that. The November LRP and the valuations that supported higher values rested on information about the Company's products and pipeline that had not been disclosed. It is reasonable to infer that the market was undervaluing the Company. Sanofi's willingness to pay so much more than the market price provides some evidence of that fact.

The defendants also make the standard argument that if the Company was worth more, then certainly a topping bidder would have emerged during the post-signing period. *See* Dkt. 24 at 52–53. If the market knew and believed that the Company was worth $150 per share, then that argument could have force, but in that alternative state of the world, the Company's common stock already would trade closer to $150 per share, and the deal would have been a massive take under. At the pleading stage, the plaintiff has advanced several credible reasons why the absence of an overbidder is not convincing evidence that the price of $105 per share represented the best value reasonably available. For one thing, some bidders could not participate because of the Restricted Period following the Spinoff.

---

[18] *Smith v. Van Gorkom*, 488 A.2d 858, 875 (Del. 1985) (subsequent history omitted). *See, e.g.*, *Mindbody*, 2020 WL 5870084, at *1, *9 (finding plaintiffs adequately pled a paradigmatic *Revlon* claim despite 68% premium); *El Paso*, 41 A.3d at 434–35 (finding reasonable probability of success on the merits of breach of fiduciary duty claim despite nominal 47.8% premium over pre-announcement market price); *Del Monte*, 25 A.3d at 817–19 (same despite nominal 40% premium); *In re Tele–Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *1–2 (Del. Ch. Dec. 21, 2005) (finding at the summary judgment stage that defendants had not demonstrated entire fairness despite 37% premium); *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *15 (Del. Ch. Nov. 24, 2004) (giving "little weight" to the "control premium argument" despite 96% premium).

For another, the complaint contains well-pled allegations to the effect that the market was not yet fully valuing the Company, and a competing bidder would not have had access to the November LRP to inform its bid. It is not possible to say at the pleading stage that the post-signing market check cleansed the sale process of its flaws.

Relying on documents outside of the complaint, the defendants argue that the Board had questioned the assumptions and risks of the November LRP, as well as the competitive dynamics facing the Company. *Id.* at 13 (citing Exs. 12–18). The defendants cannot use documents outside the complaint, even minutes produced as part of the Section 220 Documents, to contest its well-pled allegations. At most, the defendants' documents create a dispute of fact, which the court cannot resolve at the pleading stage. Even if the Company's risk-adjusted value as a standalone entity was less than $150 per share, it is reasonably conceivable that the Board made a counteroffer that undervalued the Company and did so in part because of Denner's eagerness for a sale.

### 3.    The Fairness Projections

The plaintiff separately alleges that the Board acted outside the range of reasonableness by working with Company management to make a series of last-minute modifications to the Company's projections designed to support the agreed-upon price of $105 per share. The complaint alleges facts, drawn from the Section 220 Documents, which support an inference that the Board acted unreasonably.

The complaint alleges that Company management prepared the November LRP based on management's detailed, nuanced projections about the Company's current and future product offerings. After the Board signed on to a deal at $105 per share, however,

84

Company management systematically slashed the projections in the November LRP to justify that lower price. Just four days before the Board approved the Merger Agreement, Company management was still in the process of driving down the numbers from the November LRP. On January 17, 2018, Greene sent Guggenheim an email saying "[w]e also need macro assumptions that provide context as to why we have taken a less optimistic view than what was previously shared with the board." Compl. ¶ 138. Because the Company had not experienced any new developments that would warrant downward modifications to the November LRP, Greene was looking for "macro assumptions" to justify the changes.

Two days later, on January 19, Company management presented the Fairness Projections to the Board for the first time. Conveniently, the Fairness Projections valued the Company at $99 per share, just below the agreed-upon Transaction price. The Board approved the Fairness Projections despite not having seen or discussed them before the meeting. Two days later, JP Morgan and Guggenheim delivered fairness opinions that relied on the more pessimistic Fairness Projections. *Id.* ¶ 141.

The rapid turnabout regarding the projections supports a pleading-stage inference that Company management, including Cox and Greene, acted in bad faith to create a set of numbers designed to justify the sale price. At this stage, the plaintiff is entitled to the inference that the changes to the projections were part of an unreasonable process infected by Denner's conflicts of interest.

### 4. The Pleading-Stage Conclusion Regarding The Sale Process

Taken together, the well-pled allegations of the complaint support an inference that the Board's actions fell outside the range of reasonableness. The collective weight of Denner's insider trading, his October 2017 invitation to Sanofi to engage in a single-bidder process, his role in agreeing to a price of $105, the disconnect between that price and the valuation data available to the Board, and the creation of the Fairness Projections is more than the range of reasonableness can accommodate. It is reasonably conceivable that as a result of a flawed process, the Transaction did not yield "the best value reasonably available to the stockholders." *QVC*, 637 A.2d at 43.

### D. Exculpation

Stating a viable claim under the enhanced scrutiny standard is necessary but not sufficient to survive a pleading-stage motion to dismiss when the plaintiff seeks to impose personal liability on a director. When a corporation has an exculpatory provision in its certificate of incorporation, the plaintiff must plead a non-exculpated claim against the director. The Delaware Supreme Court has instructed that when a plaintiff "seek[s] only monetary damages" from a director protected by an exculpatory provision, then to survive a motion to dismiss, the plaintiff "must plead non-exculpated claims against [the] director . . . , regardless of the underlying standard of review for the board's conduct." *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015).

The Company's certificate of incorporation contains an exculpatory provision. Ex. 31 at Article XI (the "Exculpatory Provision"). Because of the Exculpatory Provision, the Director Defendants are entitled to dismissal unless the complaint states a claim for breach

86

of the duty of loyalty. *Cornerstone*, 115 A.3d at 1179–80. To survive a motion to dismiss, the plaintiff must allege each director was interested in the Transaction, lacked independence, or acted in bad faith. *Id.*

"A director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not shared equally by the stockholders' or if 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Trados I*, 2009 WL 2225958, at *6 (quoting *Rales*, 634 A.2d at 936). For a director to be interested in the transaction, "the benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest." *Id.* (cleaned up). "Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin*, 765 A.2d at 923 (quoting *Technicolor Plenary III*, 663 A.2d at 1167).

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. A director lacks independence when the director "act[s] to advance the self-interest of an interested party from whom they could not be presumed to act independently." *Cornerstone*, 115 A.3d at 1179–80; *see also Rales*, 634 A.2d at 936; *Trados I*, 2009 WL 2225958, at *6.

87

Bad faith encompasses both "an intent to harm [and] also intentional dereliction of duty."[19] Bad faith also may be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[20] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[21] Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the

---

[19] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009); *accord In re Walt Disney Co. Deriv. Litig.* (*Disney V*), 906 A.2d 27, 64–66 (Del. 2006) (defining "subjective bad faith" as "conduct motivated by an actual intent to do harm," which "constitutes classic, quintessential bad faith," and "intentional dereliction of duty" as "a conscious disregard for one's responsibilities"); *see also Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (holding, in the context of an oversight claim, that "utter[] fail[ure] to implement any reporting or information system or controls" or "having implemented such a system or controls, conscious[] fail[ure] to monitor or oversee its operations" demonstrated "a conscious disregard for their responsibilities").

[20] *Disney V*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369; *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[21] *In re Walt Disney Co. Deriv. Litig.* (*Disney IV*), 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) (explaining that "regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest").

welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[22]

To plead bad faith in a case governed by a standard more onerous than the business judgment rule, and hence to plead an unexculpated claim for breach of fiduciary duty in that setting, a plaintiff need only "plead[] facts that support a rational inference of bad faith." *Kahn*, 2018 WL 1341719, at *1 (citing *Brinckerhoff v. Enbridge Energy Co., Inc.,* 159 A.3d 242, 258–60 (Del. 2017)). A plaintiff need not "plead facts that rule out any possibility other than bad faith." *Id.* Put differently, a plaintiff need *not* plead that the director made a decision "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Brinckerhoff*, 159 A.3d at 259 (rejecting that standard for purposes of interpreting exculpatory provision in limited partnership agreement). At trial, a plaintiff need not rule out other explanations; the plaintiff need only show by a preponderance of the evidence that the fiduciary acted for a purpose other than the best interest of the corporation. *See id*. 259–60. Likewise, at the pleading stage, a plaintiff need only plead facts supporting a reasonably conceivable inference that the fiduciary acted for a purpose other than the best interest of the corporation. *See Kahn*, 2018 WL 1341719, at *1 (applying *Brinkerhoff* test for exculpatory provision in certificate of incorporation).

---

[22] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

In this case, the complaint has stated a non-exculpated claim against Denner, Cox, Posner, Protopapas, and Germano. The complaint has not stated a non-exculpated claim against Paglia.

## 1. Denner

The complaint's allegations easily state a claim against Denner for breach of the duty of loyalty. The facts alleged in the complaint support an inference that Denner acted in bad faith at several points in the sale process.

First, the plaintiff adequately alleges that Denner acted in subjective bad faith by violating the Company's insider trading policy. The insider trading policy prohibited all "directors, officers, [and] employees . . . from trading securities, or disclosing or passing along information to others who then trade on the basis of material nonpublic information." Compl. ¶ 95. It is reasonable to infer that Sanofi's $90 per share initial expression of interest was material information not known to the public, and it is reasonable to infer that Denner bought more than a million shares on the basis of this information. That Denner made his purchases through Sarissa does not help him because the insider trading policy prohibits "passing along information to others who then trade on that material nonpublic information." *Id.* At the pleading stage, it is reasonably conceivable that Denner knowingly violated the insider trading policy.

Second, the plaintiff adequately alleges that Denner knowingly acted in bad faith by concealing his illicit stock purchases and discussions with Sanofi and Lazard from the Board. As a director, Denner "had an unremitting obligation to deal candidly with [his] fellow directors. *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999)

90

(cleaned up).[23] "To satisfy [Denner's] duty of loyalty, and its subsidiary requirement that he act in good faith, he needed to be candid with . . . his fellow board members." *Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 1342263, at *3 (Del. Ch. May 2, 2007). *See generally* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 45 (2015) (explaining that a director's failure "to provide information regarding the corporation to the board . . . may constitute a breach of fiduciary duty on the part of the . . . director[ ] responsible for the failure"). It is likewise a basic principle, firmly embedded in our law, that a director must disclose material information about any potential conflicts. *Haley*, 235 A.3d at 719.

As this decision has explained, the complaint supports a reasonable inference that Denner concealed the stock purchases that he caused Sarissa to make, as well as his discussions with Sanofi and Lazard about a potential transaction. By keeping the Board in the dark, Denner failed "to be candid . . . with his fellow board members" and acted in bad faith. *Turner*, 2007 WL 1342263, at *3.

---

[23] *Mills*, 559 A.2d at 1283 ("As the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests."); *Thorpe v. CERBCO*, 676 A.2d 436, 441–42 (Del. 1996) (stressing the importance of duty to be candid with fellow directors); *Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *7 (Del. Ch. Apr. 22, 1997) (noting that directors owe a "duty to disclose to other directors"); Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 5.02(a)(1) cmt. (1994) ("A director or senior executive owes a duty to the corporation not only to avoid misleading it by misstatements and omissions, but affirmatively to disclose the material facts known to the director or senior executive.").

The complaint also adequately alleges that Denner acted in bad faith when he manipulated the sale process to achieve a quick sale to Sanofi for his own short-term gain. *See PLX*, 2018 WL 5018535, at \*41. As discussed at length in the enhanced scrutiny analysis, it is reasonably conceivable that after purchasing significant amounts of stock based on non-public information, Denner dominated the sale process and used it to serve his personal ends, including by having unauthorized discussions with Sanofi and Lazard, unilaterally inviting Sanofi to bid for the Company, and approving an obviously false and misleading 14D-9. Through his disloyal actions, it is reasonable to infer that Denner violated "the unyielding principle that corporate fiduciaries shall abjure every temptation for personal profit at the expense of those they serve." *Mills*, 559 A.2d at 1284.

In sum, the allegations of the complaint support a reasonable inference that Denner acted in bad faith. It is reasonably conceivable that Denner will not be entitled to exculpation.

### 2. Cox

The complaint's allegations state a non-exculpated claim against Cox for the actions he took in his capacity as a director. At the pleading stage, it is reasonable to infer that Cox was interested based on the severance payments he received as a result of the Transaction.

This court has held that a plaintiff is entitled to the inference that a severance payment equivalent to two years of salary would be material to the individual.[24] The court

---

[24] *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at \*13 (Del. Ch. Oct. 11, 2019); *see Chen*, 87 A.3d at 670 (inferring at pleading stage that director's receipt of $840,500 in benefits, including a $272,803 severance package was sufficiently material to

92

also has explained "compensation from one's full-time employment is typically of great consequence to the recipient" and thus is generally material. *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006) (cleaned up).

Cox personally received a total of $72.3 million in severance benefits from the Transaction that were not shared with the stockholders generally. Those amounts dwarfed Cox's average annual compensation for 2016 and 2017 of $11.6 million. Under this court's precedents, Cox's severance payments support a reasonable inference that he was interested in the Transaction. *See Steelpoint*, 2019 WL 5092896, at *13; *Chen*, 87 A.3d at 670; *Primedia*, 910 A.2d at 261 n.45.

The defendants argue that Cox's severance payments do not create a conflict as a matter of law because they were the product of "pre-existing agreements disclosed before the [Transaction]." *See* Dkt. 24 at 55–56. There are two decisions in which this court has stated that change-in-control benefits cannot not create a conflict of interest as a matter of law when those benefits (i) are paid out pursuant to a pre-existing agreement and (ii) there is no allegation that those benefits were triggered by the specific bidder or specific

---

make him interested in merger transaction); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002) ("Absent some unusual fact—such as the possession of inherited wealth—the remuneration a person receives from her full-time job is typically of great consequence to her. It is usually the method by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated."); *see also Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *30 (Del. Ch. Apr. 14, 2017) (inferring at pleading stage that director's $587,184 bonus payment for achieving redemptions of company's preferred stock was sufficiently material).

transaction.[25] Both decisions relied on cases which did not assert that proposition as a matter of law, but rather determined on the facts presented, either when denying a motion for preliminary injunction or when granting a motion for summary judgment, that a specific change-in-control payment did not give rise to a disabling interest for a specific defendant.[26]

[25] *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (holding that complaint failed to support a reasonable inference that general counsel's change-in-control benefits created a conflict because "[g]enerally, change-in-control benefits arising out of a pre-existing employment contract do not create a conflict, and nothing in the alleged facts suggests [the general counsel's] single-trigger bonus was unique or specially negotiated in anticipation of the Apollo transaction") (cleaned up); *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013) (["T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law.").

[26] *See In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *22 (Del. Ch. May 24, 2011) (declining to enjoin merger; noting that plaintiffs argued that certain members of target management, who acted as negotiators, would receive change-in-control bonuses; finding that plaintiffs "have not shown that the executives acted on their conflicts at Smurfit-Stone's expense or that the Committee impermissibly permitted them to do so"); *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) (granting summary judgment in favor of defendants; holding CEO's accelerated vesting of stock options and a $4.5 million cash severance payment did not create an economic conflict of interest for the CEO, who would retire in connection with the merger, where (i) "the severance payment and the accelerated vesting schedule [were] legitimate contractual benefits emanating from a 1994 employment agreement," (ii) "they were the subject of arm's length bargaining and mutual consideration," and (iii) at the time of the merger, the CEO "owned equity in both companies, [and] his interest in the sell-side entity] significantly outweighed his interest in [the buyer]"); *Nebenzahl v. Miller*, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993) (declining to grant preliminary injunction and finding no reasonable probability that a breach of duty of loyalty occurred where the merger agreement guaranteed change-in-control benefits under pre-existing employment agreements to four inside directors on an eight-member board).

The two cases go a step too far by converting fact-specific holdings into a rule of law. A fiduciary is interested in a transaction when the fiduciary receives something different than stockholders as a whole and when that something is material to the fiduciary. *See, e.g.*, *Rales*, 634 A.2d at 936; *Frederick Hsu*, 2017 WL 1437308, at \*30; *Trados I*, 2009 WL 2225958, at \*6. The fact that the individual receives the payment or other differential interest because of an existing agreement does not change the fact that the individual receives the payment or other differential interest. If a fiduciary is choosing between two deals, one that will cause the fiduciary to receive $72.3 million personally and the other that will not, the fiduciary has an interest in the first deal. That interest exists regardless of whether the $72.3 million is provided as part of the deal or under a pre-existing contract.

To assert that a transaction-related benefit cannot give rise to a divergent interest simply because an existing contract calls for the payment is particularly strange for change-in-control payments, because one of their evident purposes is to create financial incentives for executives to favor transactions that otherwise might disrupt their employment and which they therefore might resist. Some scholars have argued that change-in-control payments are harmful because they constitute a form of managerial self-dealing, encourage managerial slack, and then enable managers to benefit from a takeover at the stockholders' expense.[27] Others suggest that change-in-control payments are beneficial because they

---

[27] *See, e.g.*, Lucian Bebchuk et al*., Golden Parachutes and the Wealth of Shareholders,* 25 J. Corp. Fin. 140, 141, 150–53 (2014). *See generally* Andrew C.W. Lund & Robert Schonlau, *Golden Parachutes, Severance, and Firm Value*, 68 Fla. L. Rev. 875,

align managers' interests with the stockholders' interest in taking a premium bid.[28] There continues to be a debate about whether change-in-control agreements increase or decrease firm value. *See generally* Lund & Schonlau, *supra*, at 884–87, 905–06. There does not appear to be anyone who argues that change-in-control payments fail to have any incentive effect.

It is possible to imagine facts where a defendant might contend successfully on the facts of a given case that a change-in-control benefit did not give rise to a conflict for purposes of a particular decision. If a defendant faced a choice between two deals, both of which would cause the defendant to receive the same benefit, then *as to the decision between those two deals*, the defendant would not have a conflict. But as to other

---

877 (2016) (noting the view of some scholars that change-in-control agreements "provide significant *ex ante* effort disincentives for CEOs by mitigating the threat of employment termination"); Simone M. Sepe & Charles K. Whitehead, *Rethinking Chutes: Incentives, Investment, and Innovation*, 95 B.U. L. Rev. 2027, 2029 (2015) (identifying competing views of change-in-control agreements and collecting authorities supporting this view).

[28] *See, e.g.*, Jonathan M. Karpoff et al., *Do Takeover Defense Indices Measure Takeover Deterrence?*, 30 Rev. Fin. Stud. 2359, 2365 (2017) (finding that the presence of change-in-control agreements is positively correlated with the likelihood of a takeover); Eliezer M. Fich et al., *On the Importance of Golden Parachutes*, 48 J. Fin. & Quant. Analysis 1717, 1718–21 (2013) (concluding that change-in-control agreements materially increase deal completion rates, create large gains for target CEOs, and may benefit target stockholders). *See generally* Lund & Schonlau, *supra*, at 876 (noting the view of some scholars that change-in-control agreements "may serve as an adaptive device that aligns managers' interests with those of shareholders, particularly shareholders' interest in receiving takeover bids at a premium to current share price"); Sepe & Whitehead, *supra*, at 2029–30 (collecting authorities supporting this view).

alternatives that would not trigger the payment, the fiduciary has a conflict. Cox had $72.3 million reason to favor the benefit-triggering option over the non-benefit triggering option.

It is also true that on the facts of a given case, the evidence may show that a change-in-control payment did not give rise to a conflict of interest or that the fiduciary in question did not succumb to it. The decisions in *Western National*, *Smurfit-Stone*, and *Nebenzahl* provide examples of the court making that type of determination based on a factual record. It does not follow that the receipt of a pre-existing contractual benefit, solely by virtue of being a pre-existing contractual benefit, cannot create a conflict as a matter of law.

The change-in-control payment that Cox received constituted a benefit not shared with the Company's other stockholders. It was sufficiently large to be material. It therefore constitutes a compromising interest.

The complaint supports an inference that loyal fiduciaries would not have sold the Company at all because the value maximizing alternative was to continue operating in standalone mode. Under that option, Cox would not have received the severance benefits. As between a sale process that resulted in a near-term sale to Sanofi and the decision to continue operating as a standalone entity, Cox had a conflict of interest. Cox may show at a later stage of the case that he did not succumb to that interest, or that the real-world extent of the interest was mitigated by other factors. At this stage of the proceeding, the allegations of the complaint support a reasonable inference that Cox will not be entitled to exculpation.

### 3.    Posner

The complaint's allegations state a non-exculpated claim against Posner. The plaintiff argues that Posner lacked independence from Denner, was interested in the

Transaction, and acted in bad faith. The complaint sufficiently pleads that Posner acted in bad faith.

Starting with independence, the plaintiff argues that Posner was beholden to Denner based on "his history with Denner and Icahn." Dkt. 31 at 50. For support, the plaintiff alleges that (i) Icahn added both Denner and Posner to the Biogen board as part of a multi-year activist campaign, (ii) Icahn previously nominated Posner to the board of Yahoo! as part of an activist campaign (Posner did not become a Yahoo! director), and (iii) Denner and Posner have served on Biogen's board together since 2009. Compl. ¶¶ 15, 30. Those allegations would be pertinent to evaluating Posner's independence from Icahn. They do not provide reason to doubt Posner's independence from Denner.

In terms of interestedness, the plaintiff argues that Posner received $2.5 million through the acceleration of his unvested options and RSUs. Delaware courts are rightly skeptical that director equity creates a disqualifying interest where, as here, the director received the same per-share consideration as all other stockholders.[29] That does not mean that a disqualifying interest cannot exist.

---

[29] *See, e.g.*, *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at * 13 n.64 (Del. Ch. Feb. 29, 2012) (rejecting argument that directors were interested due to vesting of stock options because "the directors' interests would be aligned with the shareholders in seeking the highest price for their shares reasonably available"); *Globis*, 2007 WL 4292024, at *8 (stating that the accelerated vesting of modest stock options did not render directors interested because the "interests of the shareholders and directors [were] aligned in obtaining the highest price").

The fact of acceleration confers an additional benefit on the director, resulting in the director receiving consideration for unvested equity awards that might not vest in the fullness of time. *See, e.g.*, *In re Tesla Motors Inc. S'holder Litig.*, 2022 WL 1237185, at *4 n.24 (Del. Ch. Apr. 27, 2022) (finding that officer's compensation was "nowhere near" the disclosed value because the disclosed value included equity awards and "[t]he overwhelming majority of [those] equity awards, consisting of restricted stock awards and option awards, never vested" (cleaned up)). The fact of acceleration also results in the director receiving consideration for the unvested options at closing, rather than at some future date, and therefore provides a benefit in terms of the time value of money.

This court has recognized that situations may cause the acceleration and immediate payout of unvested equity awards to confer a material benefit. *See Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *13 n.148 (Del. Ch. Jan. 25, 2019), *aff'd*, 237 A.3d 818 (Del. 2020) (TABLE). In *Saba Software,* Vice Chancellor Slights found that the complaint adequately alleged the board was interested in the transaction based on the acceleration of equity awards because "the looming deregistration neutralized the equity awards, [and] the prospect of a merger with [buyer] was the only means to revive them and convert them to cash." 2017 WL 1201108, at *21.

To plead a persuasive basis for interest based on the acceleration of unvested equity awards, the plaintiff must provide a reasonably conceivable quantification of the amount of value conferred by the acceleration. The value of the awards at the deal price necessarily incorporates the amount of value conferred by the acceleration, but it is not a reasonably conceivable quantification of that value. The value of the acceleration is a different

concept, and mathematically it should be a lower figure because it is but one component of the aggregate value received. In this case, plaintiff has not alleged facts sufficient to support an inference that the vesting of options and other equity awards and the immediate payout on those awards created a material conflict of interest.

The plaintiff also argues that Posner had a conflict of interest as a dual fiduciary of the Company and Biogen. According to the plaintiff, Posner "had an incentive to ensure the [sale] process protected Biogen's interests," which meant Posner had an incentive to protect "Biogen's interest in enforcing [the Tax Matters Agreement] and avoiding any tax liability to Biogen." Dkt. 31 at 51; Compl. ¶ 55. The plaintiff's argument is difficult to follow. The plaintiff seems to be saying that Posner would have had an incentive to sell to a company like Sanofi rather than risking a sale to a restricted party that would jeopardize the tax treatment for the Spinoff. But that same dynamic would have given Posner an incentive to wait to sell the Company until after the Restricted Period ended. It is not clear how the interests of Biogen and the Company would have diverged on this point. Both shared an interest in avoiding any tax liability for the Spinoff.

The complaint does, however, support a reasonable inference that Posner acted in bad faith during the sale process. It is reasonably conceivable that Posner engaged in early discussions with Sanofi and concealed those discussions from the Board. By keeping the Board in the dark about this material information, Posner failed to be candid with the Board. *Turner*, 2007 WL 1342263, at *3. The complaint thus adequately pleads that Posner acted in bad faith.

100

### 4.    Protopapas

Whether the complaint's allegations support a reasonable inference of a non-exculpated claim against Protopapas presents a close call. The complaint attempts to portray Protopapas as a Denner ally who learned how Denner operates during the Ariad sale, joined the Board intending to help Denner accomplish the same thing at the Company, and acted in bad faith by failing to pursue the best interests of the Company. At the pleading stage, the complaint's allegations provide enough to make the account reasonably conceivable.

Under existing case law, "past relationships and payments [may support] a reasonable inference of 'owingness' sufficient to create a reasonable doubt about the director's ability to be impartial."[30] "Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction." *Orman v. Cullman*, 794 A.2d at 27 n.55 (Del. Ch. 2002).

---

[30] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *42 & n.49 (Del. Ch. Jan. 25, 2016) (collecting authorities); *accord In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001) (past benefits "may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised"); *see also Sandys v. Pincus*, 152 A.3d 124, 131, 134 (Del. 2016) (inferring that two directors were not independent of a controller for purposes of Rule 23.1 where they had "a mutually beneficial network of ongoing business relations" based on past investments and service on company boards).

Scholars have shown that gaining or losing a directorship is generally material to an individual director.[31] It follows that when an influential party has bestowed a directorship on an individual in the past or has the power to reward an individual with directorships in the future, then the individual may seek to serve the interests of that influential party. The desire to establish, maintain, or strengthen a relationship with the influential party could support an inference that the director was not independent or failed to act in good faith. For example, this court has drawn an inference for purposes of a Rule 12(b)(6) analysis that a director was not independent of a venture capital fund where the director "had previously served on the board of directors of at least two other [fund portfolio] companies" and "[the

---

[31] *See, e.g.*, Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 525–26, 531–50 (2019) (presenting empirical research showing directors' behavior is sensitive to both fear of losing board seats and reward of obtaining additional board seats); Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 25 (2004) (describing benefits of board service and concluding that "[i]n most cases, these benefits are likely to be economically significant to the director"); David Yermack, *Remuneration, Retention, and Reputation Incentives for Outside Directors*, 59 J. Fin. 2281, 2282, 2307 (2004) (finding "statistically significant evidence that outside directors receive positive performance incentives from compensation, turnover, and opportunities to obtain new board seats" that have a direct impact on the accumulation of wealth by that director and "considering that an outside director may serve on several boards, these incentives appear non-trivial, albeit much smaller than those offered to top managers"). The ability of an influential person to help a director replace a board seat is particularly significant, because board seats are difficult to obtain. *See* Jarrad Harford, *Takeover Bids and Target Directors' Incentives: The Impact of a Bid on Directors' Wealth and Board Seats*, 69 J. Fin. Econ. 51, 68 (2003) (finding statistical evidence that a board seat is difficult to replace, because directors who lose a seat as a result of a takeover can expect to hold one fewer directorship than peers for two years following a completed merger; finding that directors suffer a net financial penalty from the loss of the directorship "between zero and -$65,443"); *see also* David I. Walker, *The Manager's Share*, 47 Wm. & Mary L. Rev. 587, 633 (2005) (arguing that from an economic perspective, "[t]he incentive to retain a board position generally outweighs the incentive to maximize shareholder value").

fund] used [the director] as a short-term high-ranking executive in companies in which [the fund] invested." *Goldman*, 2002 WL 1358760, at *3. This court has also drawn an inference for demand futility purposes under Rule 23.1 that a director was not independent from a controller where he previously "received $30,000 from [the controller] for agreeing to be a director nominee in [the controller's] proxy bid" for another company. *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001). And in a post-trial decision, this court explained that the web of relationships that characterized the Silicon Valley startup community could result in nominally independent directors having incentives to side with venture capital firms:

> Many of these outside directors have—or can expect to have—long-term professional and business ties with the VCs, who are more likely to be repeat players than are most of the common shareholders. Cooperative outside directors can expect to be recommended for other board seats or even invited to join the VC fund as a "venture partner."

*Trados II*, 73 A.3d at 54 (quoting Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups*, 81 N.Y.U. L. Rev. 967, 989 (2006)). The court noted that for purposes of challenging the director's independence at trial, the plaintiff could not rely on "general characterizations of the VC ecosystem," but rather had to introduce proof of a sufficient connection. *Id.* On the facts presented, the court found that the director's current and past relationships with a venture capital fund and a particular partner at that fund compromised the director's independence. *Id.* at 55.

In work that focuses on relationships with controlling stockholders, Professor Da Lin has explored the ability of directors to be influenced by the prospect of reward. *See* Lin, *supra*, at 517. By examining the professional connections between directors and

103

controllers, she finds that some controllers regularly reappoint cooperative independent directors to executive and board positions at other firms. *Id.* She also explores how different types of controllers have differing abilities to reward directors. She finds that controllers with a wider base of investments are much more likely to have repeat relationships with the nominally independent directors who serve on their boards. *Id.* at 543–46. She also finds that controllers who are single natural persons, as opposed to family groups or widely held corporations, are more likely to have repeat relationships with nominally independent directors. *Id.* She recommends that courts move towards a more nuanced doctrine for analyzing independence which takes into account the ability of certain controllers who are repeat players and who have a wide base of investments to influence nominally independent directors through rewards. *Id.*

Although Lin's work focuses on controllers, she observes that the same insights apply to investment funds that have the ability to appoint individuals to multiple boards over time. *Id.* at 545–46. She observes that venture capital and private equity firms are long-term repeat players, giving directors substantial incentives to favor their interests.[32]

---

[32] *Id.* at 546. *See* Fried & Ganor, *supra*, at 989 n.63 (noting that "conversations with local VCs confirm" that "independent directors" have incentives to side with VCs); D. Gordon Smith, *The Exit Structure of Venture Capital*, 53 UCLA L. Rev. 315, 320 (2005) ("[I]n the event of conflict between the venture capitalist and the entrepreneur, such outside directors may have a natural inclination to side with the venture capitalist."); William W. Bratton, *Venture Capital on the Downside: Preferred Stock and Corporate Control*, 100 Mich. L. Rev. 891, 921 (2002) (arguing outside directors are "highly susceptible to the influence of the VC").

Recent research has found similar repeat-player effects involving bankruptcy directors.[33] The scholars identified a phenomenon in which independent directors join a board around the time that the company files for Chapter 11. The new directors are held out as independent and empowered to make key decisions regarding the bankruptcy. The scholars note, however, that the new directors

> suffer from a structural bias resulting from being part of a closely-knit community: a handful of private-equity sponsors that control distressed companies routinely turn to a handful of law firms for representation and per their advice pick these bankruptcy directors from a small pool.

*Id.* at 44. The scholars argue that the dynamics of a small network of repeat players and the prospect of future engagements are sufficient to call into question the directors' independence.

This court's task is to evaluate for pleading-stage purposes whether it is reasonably conceivable that Protopapas was not independent of Denner or otherwise acted in bad faith to support a transaction that was in the best interests of Sarissa, rather than in the best interests of the Company and its stockholders. The scholarly insights into repeat-player relationships offer insight into Protopapas' relationship with Denner.

Denner and Sarissa are repeat players in the biopharma and healthcare sector. For an activist hedge fund like Sarissa, the ability to secure board seats is a potent weapon. For that weapon to function, Sarissa needs a pool of potential directors. Because Denner is an

---

[33] Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors*, 95 S. Cal. L. Rev. (forthcoming 2022) (manuscript at 3–4), *available at* https://ssrn.com/abstract=3866669.

activist who creates opportunities to put candidates on boards, he can reward supportive directors. He can also decide against nominating an uncooperative director. It is reasonably conceivable that Denner cultivates symbiotic relationships in which he helps individuals secure lucrative directorships on the boards of the companies that Sarissa targets or controls, and in return the individuals back Denner's goals in his activist campaigns. A long-standing history of interactions would not be necessary for the carrot to have an effect. All that would be needed is a director's desire to cultivate such a relationship. Nor would there need to be an explicit *quid pro quo*. The fund's practice of rewarding directors would be a sufficient signal.

The complaint contends that Protopapas and Denner cultivated such a relationship. The complaint alleges in detail how Protopapas supported Denner in achieving the sale of Ariad to Protopapas' former employer. Less than two weeks later, Denner secured Protopapas' appointment as a director of the Company. After joining the Board, Protopapas supported the Transaction and benefitted herself in the process. For one year's board service, in addition to her director compensation, Protopapas received $1.8 million for her unvested options and RSUs that accelerated as a result of the Transaction. Protopapas is also connected to Denner through Mersana, where Protopapas has served as President and CEO since 2015. Sarissa is one of Mersana's three largest stockholders, owning approximately 8% of the outstanding shares.

The complaint alleges that Protopapas' relationship with Denner is not an isolated example. Denner also secured a director seat for Germano at the Company and The Medicines Company. And he added Paglia to the board of Sarissa Capital Acquisition

Corp. Compl. ¶¶ 26, 34, 38. The complaint suggests that Denner is a person who looks out for his friends.

The question is whether, at the pleading stage, there is sufficient reason to doubt whether Protopapas acted independently of Denner and in good faith. Ultimately, under the deferential pleading standard of Rule 12(b)(6), the plaintiff has done enough to make it reasonably conceivable that Protopapas supported a sale of the Company to be supportive of Denner. Although not overwhelming, the combination of (i) Protopapas' involvement in, and the financial rewards from, the Ariad sale, (ii) the temporal proximity of the Ariad sale and Protopapas' appointment to the Board, (iii) Denner's practice of rewarding directors with lucrative directorships on other Sarissa-affiliated boards, and (iv) the backdrop of a single-bidder sale at a price substantially below the standalone value implied by the November LRP is enough to land the complaint's allegations in the realm of reasonable conceivability.

Outside of a Rule 12(b)(6) motion in a case governed by enhanced scrutiny, it is unlikely that a similar constellation of facts would be sufficient to overcome the presumption of good faith or to call a director's independence into question. For example, "the 'reasonable doubt' standard used in a demand futility analysis provides a higher hurdle for a plaintiff than the relatively lenient standard of review pursuant to Rule 12(b)(6)." *Primedia*, 910 A.2d at 256 n.13. To survive a motion to dismiss under Rule 23.1, for example, a plaintiff would have to plead more. *See In re BGC P'rs, Inc.*, 2019 WL 4745121, at *15 & n.142 (Del. Ch. Sept. 30, 2019) (finding plaintiffs had adequately alleged a director lacked independence under Rule 12(b)(6), but not under Rule 23.1, where

107

plaintiffs "ha[d] not ple[d] facts suggestive of a meaningful personal relationship between [the director] and [the controller] outside of [the director's] lengthy service on [controller]-affiliated boards"). Nor is it clear that the same constellation of facts would render Protopapas non-independent for purposes of rebutting the business judgment rule and causing entire fairness to apply. The Transaction, however, is subject to enhanced scrutiny, and hence the plaintiff need only "plead[] facts that support a rational inference of bad faith." *Kahn*, 2018 WL 1341719, at *1. When all aspects of the Denner-Protopapas relationship are viewed in a light most favorable to the plaintiff, against the backdrop of a transaction in which Protopapas supported a near-term sale at a price significantly below reliable indications of standalone value, the allegations support a rational inference that Protopapas failed to act in good faith.

As an additional basis for attacking Protopapas, the plaintiff asserts that Protopapas was interested in the Transaction because she received $1.8 million for unvested options and RSUs that accelerated as a result of the Transaction. For the reasons already discussed, the plaintiff has not pled sufficient facts to support an acceleration-based theory of interest on the facts of this case.

### 5. Germano

The plaintiff attacks Germano's independence using the same theories that the plaintiff used against Protopapas. Once again, the complaint seeks to portray a mutually beneficial relationship in which Germano supports Denner's efforts, and Denner rewards Germano. Once again, the complaint seeks to argue that Germano also received merger-

related benefits. As with Protopapas, the account presents a close call. Once again, the complaint's allegations provide enough to make the account reasonably conceivable.

The complaint's attack on Germano depends on the concept of reward. Unlike Protopapas, Germano did not have a history of involvement with Denner before this deal. Instead, before his appointment to the Board, Germano was unemployed after an unsuccessful stint as an executive of Intrexon. Denner secured Germano's seat on the Board shortly after the Spinoff, and just after Lazard's initial approach about a potential transaction with Sanofi. In November 2017, after inviting Sanofi to make a bid, Denner used his position on the board of directors of The Medicines Company to secure a seat on that company's board for Germano. The complaint alleges that Germano and Denner later engineered a sale of The Medicines Company that earned Germano $3 million for his shares, options, and RSUs after only two years on that company's board of directors. Compl. ¶ 38. That deal also earned Sarissa $364 million for its shares plus $3.7 million for Denner personally. *Id.*

Together, these facts make it reasonably conceivable that Germano supported a sale of the Company to be supportive of Denner, rather than because the Transaction was in the best interests of the Company. It is reasonably conceivable that, as the chair of the Board's Corporate Governance Committee, Denner played a key role in the appointment of Germano to the Board. It is reasonably conceivable that the appointment would have inspired some level of gratitude on Germano's part since he had been out of a job since 2016. It is reasonably conceivable that Germano was aware of Denner's practice of looking out for his friends by helping them secure lucrative directorships. Taken together, the

109

plaintiff has satisfied the lenient pleading standard of Rule 12(b)(6). Like Protopapas, these allegations are not overwhelming, but they are sufficient to support a rational inference that Germano acted in bad faith by supporting the Transaction out of gratitude for Denner's help and an expectation of future rewards.

As with Protopapas, the plaintiff also seeks to attack Germano by arguing that he was interested in the Transaction because he stood to receive $1.7 million for unvested options and RSUs that accelerated as a result of the Transaction. As with Protopapas, it is theoretically possible that acceleration could confer an additional and material benefit, but the plaintiff has not done the work here to plead the existence of that benefit.

### 6. Paglia

The complaint's allegations fail to state a non-exculpated claim against Paglia. The plaintiff challenges Paglia's independence from Denner because, after the Transaction, Denner selected Paglia to serve as a director of Sarissa Capital Acquisition Corp., a special purpose acquisition company that Denner founded. *Id.* ¶ 34. This is the only connection that the plaintiff identifies.

Paglia served on the Biogen board before the Spinoff, and he was one of the four directors of the Company at the time of the Spinoff. The complaint does not support a reasonable inference that Denner brought Paglia onto the Board, nor does the timing of Paglia's arrival seem significant. It is also not clear when Denner picked Paglia to be a director for Sarissa's SPAC. The complaint says it happened "recently," but that is all. *Id.* Whether a complaint pleads enough to call a director's judgment into question for purposes of an unexculpated claim will always be a matter of degree. The facts that the plaintiff has

110

alleged about Paglia are not sufficient to support a reasonable inference that he acted to support Denner or for some other improper purpose,

The plaintiff also argues that Paglia was interested in the Transaction because he stood to receive $2.2 million for his unvested options and RSUs that accelerated as a result of the Transaction. As previously explained, this allegation does not support a reasonable inference of interestedness.

## E.     The Claims Against The Officer Defendants

In addition to targeting the Director Defendants, the plaintiff asserts that the Officer Defendants breached their fiduciary duties through their participation in the sale process. The plaintiff maintains that Cox and Greene failed to inform the Board about Denner's stock purchases, which would have alerted the Board to Denner's interest in the Transaction. *Id.* ¶ 106. The plaintiff also asserts that Cox and Greene slashed the projections in the November LRP to create the Fairness Projections with the goal of justifying the sale price. The plaintiff alleges that DiFabio exaggerated what occurred at Board meetings during the sale process, then allowed those exaggerated accounts to become the basis of the disclosures in the Schedule 14D-9.

Under current law, the plaintiff may recover damages from the Officer Defendants in their roles as corporate officers for either a breach of the duty of loyalty or the duty of care. *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *15 (Del. Ch. Dec. 30, 2019). "[C]orporate officers owe fiduciary duties that are identical to those owed by corporate directors." *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009). To comply with the duty of loyalty, a corporate officer must act in subjective good faith, which requires

111

officers "scrupulously to place the interests of the corporation and shareholders that they serve before their own."[34] Like directors, officers breach the duty of loyalty if they act out of a material self-interest that diverges from the interests of the stockholders, are "sufficiently loyal to, beholden to, or otherwise influenced by an interested party," or intentionally "act[ ] in bad faith for a purpose other than advancing the best interests of the corporation." *Frederick Hsu*, 2017 WL 1437308, at \*26, \*39 (cleaned up).

An officer's compliance with the duty of care is evaluated for gross negligence. To plead gross negligence, a plaintiff must allege conduct that constitutes "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions that are without the bounds of reason." *Columbia Pipeline*, 2021 WL 772562, at \*50 (cleaned up).

---

[34] *TVI Corp. v. Gallagher*, 2013 WL 5809271, at \*25 (Del. Ch. Oct. 28, 2013); *see Guth v. Loft, Inc.*, 5 A.2d 503, 510 (1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.").

Officers also owe fiduciary duties in their capacities as agents. *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at \*21 (Del. Ch.), *aff'd*, 243 A.3d 417 (Del. 2020). Within this relationship, officers have a duty to comply with directives from the board and any more senior agents with greater authority to whom the officer reports.[35] The duty of obedience does not require compliance with directives that would expose an officer to criminal or civil sanctions or liability.[36] Thus, an officer does not have a duty to comply with directives that the officer has reason to believe would constitute a breach of fiduciary duty.

Officers also have a duty as agents to provide information to the board and any more senior agents with greater authority to whom the officer reports.[37] The duty to provide

---

[35] *See generally* Restatement (Third) of Agency § 8.09 (Am. Law Inst. 2006), Westlaw, (database updated March 2022) [hereinafter Restatement of Agency]. Stated in the negative, an officer "may not act in a manner contrary to the express desires of the board of directors." *Disney IV*, 907 A.2d at 775 n.570.

[36] *See* Restatement of Agency, *supra*, § 8.09 ("An agent has no duty to comply with instructions that may subject the agent to criminal, civil, or administrative sanctions or that exceed legal limits on the principal's right to direct action taken by the agent. Thus, an agent has no duty to comply with a directive to commit a crime or an act the agent has reason to know will be tortious.").

[37] *See AmerisourceBergen*, 2020 WL 132752, at \*21 ("Both as corporate fiduciaries and as agents, officers also have a duty to provide the board of directors with information that the directors need to carry out their duties and perform their statutory role."); *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at \*13 (Del. Ch. July 12, 2010) (describing an officer's "contextual obligations" as a fiduciary as including "the responsibility to disclose to their superior officer or principal material information relevant to the affairs of the agency entrusted to them" (cleaned up)); *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007) (holding that complaint stated claim for breach of the duty of loyalty against CFO and vice president who knew about backdating but "kept silent"); *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) ("[S]ince the relationship between

113

information includes a duty not to mislead other fiduciaries: "[F]iduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." *Mills*, 559 A.2d at 1283.

### 1. Cox

This decision already has held that the allegations of the complaint make it reasonably conceivable that Cox was interested in the Transaction. Against that backdrop, the plaintiff has pled facts that support a reasonable inference that Cox acted disloyally when failing to disclose Sarissa's stock purchases to the Board and when creating the Fairness Projections.

As an officer, Cox had a duty to provide information to the Board. On October 30, 2017, Guggenheim sent Cox and Greene a presentation that identified the top buyers of the Company's stock in the second quarter of 2017. Sarissa was the seventh largest buyer. Greene and Cox did not disclose Sarissa's purchases to the Board.

---

a principal and agent is fiduciary in character, the agent . . . must act not only with candor, but with loyalty."); *Hall v. Search Cap. Gp., Inc.*, 1996 WL 696921, at *2 (Del. Ch. Nov. 15, 1996) ("When management communicates with the directors on matters of concern to the Board collectively, it cannot pick and choose which directors will receive that information."); *see also Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988) (Allen, C.) ("A director does breach his duty of loyalty if he knows that the company has been defrauded and does not report what he knows to the board or to an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection."). *See generally* Restatement of Agency, *supra*, § 8.11 (describing agent's duty to provide principal with facts that the agent knows); Laster & Zeberkiewicz, *supra*, at 45 (describing officer's duty to provide information regarding the corporation to the board).

The complaint supports a reasonable inference that Cox failed to inform the Board about Sarissa's purchases because he recognized that Denner was driving towards a transaction that would benefit Cox personally. Sanofi's first official, non-binding offer letter arrived four days after Cox learned about the stock trades. *See* Compl. ¶¶ 106–07. It is reasonably conceivable that Cox realized that Denner had caused Sarissa to make purchases based on inside information. By choosing not to inform the Board of Denner's wrongdoing, Cox avoided the possibility that the Board would re-evaluate, delay, or abandon the sale process. By keeping the Board in the dark, Cox failed to be candid with the Board. *Turner*, 2007 WL 1342263, at *3.

The complaint also states a claim for breach of the duty of loyalty against Cox for his role in preparing the Fairness Projections. When a fiduciary "intentionally understate[s] the prospects of [the company] in order to facilitate the merger, his fiduciary duties are implicated." *Id.* at *5. The complaint alleges that Company management prepared the November LRP based on detailed and careful assessments of the Company's current and future product offerings. The complaint also alleges that the projections based on the November LRP showed that Sanofi's offer vastly undervalued the Company. Compl. ¶ 118.

After the Board signed on to a deal at $105 per share, however, Company management systematically slashed the projections in the November LRP to justify that lower price. Cox participated in the downward revisions. It is reasonable to infer that Cox revised the projections downward to help secure a Transaction in which he was personally interested. The complaint therefore states a claim for breach of the duty of loyalty against

115

Cox for his role in preparing the Fairness Projections. Although the defendants argue pedantically that the complaint does not "say that Cox 'participated in' manipulating projections," Dkt. 33 at 33, it is reasonably conceivable that as the CEO of the Company, Cox participated in preparing the Fairness Projections.

### 2. Greene

The complaint states a claim against Greene for breach of the duty of loyalty. Like Cox, Greene was interested in the Transaction because he stood to reap material personal benefits from the Transaction. Greene stood to receive over $18.4 million in severance payments and unvested options and RSUs that were accelerated as a result of the Transaction. That amount was nearly four times Greene's annual compensation of $5.1 million as the CFO of the Company. Consequently, it is reasonably conceivable that Greene was interested in the Transaction.

The complaint states claims against Greene that parallel the claims against Cox. Greene learned of Sarissa's illicit stock purchases when Cox learned of them. Compl. ¶ 106. Like Cox, Greene failed to inform the Board. *Id.* Like Cox, Greene played a substantial role in creating the Fairness Projections. *See id.* ¶ 138 (Greene's January 17 email commenting on slides comparing the November LRP and the Fairness Projections and stating that they needed to provide "macro assumptions" to justify the downward revisions).

The defendants' argument that "the November LRP was revised in response to Board dialogue" does not help Greene's case. Dkt. 33 at 34. Even if the Board had directed Greene to slash the projections, Greene did not have a duty to comply with a directive that

116

would have caused him to breach his fiduciary duties. *See* Restatement of Agency, *supra*, § 8.09. It is reasonable to infer that Greene knew the modifications were divorced from reality and yet made them anyway.

### 3. DiFabio

The complaint states a claim against DiFabio for breach of the duty of loyalty. Like Cox and Greene, DiFabio stood to reap a material personal benefit from the Transaction. DiFabio stood to receive over $14.4 million in severance payments and unvested options and RSUs that accelerated as a result of the Transaction. That amount was more than four times DiFabio's annual compensation as the chief legal officer of the Company. Consequently, it is reasonably conceivable that DiFabio was interested in the Transaction.

The complaint alleges that DiFabio took steps to create a record that would enable the Transaction to close. But rather than creating a record in the sense of creating documents that accurately reflected what had taken place, DiFabio created a record in the sense of engaging in acts of creativity. The plaintiff alleges that DiFabio documented events that did not occur and described other events in a manner that made the process seem better than it was.

As their signature example, the plaintiff points to inconsistencies between the January 4 Minutes and the emails produced in the Section 220 Action. At the pleading stage, the plaintiff has pointed to sufficient inconsistencies to state a claim on which relief can be granted.

The minutes contain the following narrative:

- The meeting began at 8:00 a.m. on January 4, 2018. Ex. 18 at 1.

117

- After a discussion with their advisors and Company management, the Board decided to counteroffer at a price of $105 per share. *Id.*

- "The Board authorized Dr. Denner to contact a representative Lazard [sic] . . . and to determine whether Sanofi was prepared to proceed on that basis." *Id.*

- During the meeting, Denner received a call from Lazard. He then left the meeting to convey to Lazard "that the Company was prepared to move forward with discussions if Sanofi committed to a price of $105.00 per Share in cash." *Id.* at 2.

- "Shortly thereafter, the representative from Lazard called Dr. Denner back and conveyed that, after checking with certain representatives from Sanofi, Sanofi was prepared to move forward on that basis, but that Sanofi would require the Company to agree to a period of exclusivity through January 26, 2018 . . . ." *Id.*

- Denner then rejoined the Board call and provided a summary of his discussion with Lazard. *Id.*

The minutes then state that the Board and its financial and legal advisors discussed

a panoply of relevant considerations, including

(i)     the significant premium offered by Sanofi (and the fact that Sanofi's latest offer price was conditioned upon, among other things, an exclusivity period through January 26, 2018),

(ii)    the level of interest and engagement demonstrated by Sanofi to date,

(iii)   the proposed accelerated timeline to announce the transaction,

(iv)    the risk that Sanofi might decide not to proceed with a transaction if the Company did not commit to move forward on the terms proposed in Sanofi's January 4[] offer,

(v)     the risk of a leak, particularly given the upcoming J.P. Morgan Healthcare Conference, and

(vi)    the fact that the anticipated terms of the proposed transaction would not make it difficult for other interested parties to submit a superior proposal during the pendency of the transaction.

*Id.* (formatting added). The Board then voted to authorize the grant of exclusivity that Sanofi had requested, and instructed Company management and the Company's legal and financial advisors to begin the negotiations necessary to finalize the Transaction. *Id.* In short, it was a busy meeting.

The plaintiff argues that the minutes conflict with emails produced in the Section 220 Action. The plaintiff first cites an email Posner sent to the Board and its advisors at 11:36 a.m. on January 4, 2017:

> As per Lazard via [Denner], price of $105 has been agreed to by [Sanofi].
>
> Bankers being alerted by [Denner].
>
> Scott [an attorney at Paul Weiss] and [DiFabio], please be available for that which is required at this moment.
>
> Board - thank you for your independent thought and counsel.
>
> I am available later this evening to talk.

Compl. ¶ 133 (quoting Ex. 19). The plaintiff maintains that "[i]f the January 4 Board meeting was ongoing and Denner rejoined it as the January [4] Minutes state, Posner would not have emailed the Board, JP Morgan, Guggenheim and Paul Weiss to inform them that Sanofi had agreed to $105 per share," because the minutes state that those individuals already were in the meeting when Denner summarized his call with Lazard. *Id.* ¶ 134.

The plaintiff also relies on an email from JP Morgan at 12:12 p.m. on January 4 stating that JP Morgan had "caught up with [Denner]" and were "speaking with Lazard shortly to firm up diligence and process." *Id.* ¶ 135 (quoting Ex. 19 at '915). The plaintiff further relies on an email from Guggenheim at 12:27 p.m. stating that Guggenheim had

119

"just hung up with Lazard." *Id.* (quoting Ex. 19 at '914). Finally, the plaintiff relies on congratulatory emails from Germano and Denner, sent at 12:30 p.m. and 12:39 p.m. respectively, thanking the participants for their work on the potential transaction. *Id.* The plaintiff argues that "[n]one of these emails would have been sent if the January 4 Board meeting had occurred like the January [4] Minutes state that it occurred." *Id.*

At the pleading stage, the court cannot find facts or weigh competing inferences. There are defendant-friendly ways to reconcile the internal emails with the account in the minutes. But the plaintiff has advanced a possible account in which DiFabio created an embellished description of the Board's deliberative process. Discovery may show that the minutes were accurate. At this stage of the case, the plaintiff is entitled to the inference that the minutes were not.

The complaint therefore states a claim against DiFabio for her role in preparing the minutes. It is reasonable to infer that DiFabio drafted the minutes to pursue her personal interest in helping the Transaction take place.

## IV. THE DISCLOSURE CLAIMS

In addition to the Sale Process Claims, the plaintiff asserts the Disclosure Claims. Directors owe a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action," just as when seeking stockholder approval for a merger. *Stroud*, 606 A.2d at 84. The same duty applies to officers. *See, e.g.*, *Presidio*, 251 A.3d at 288; *Roche*, 2020 WL 7023896, at *19–23; *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15–16 (Del. Ch. Oct. 27, 2020).

120

The duty of disclosure is a context-specific application of the board's fiduciary duties. *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). It "is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted). When seeking injunctive relief for a breach of the duty of disclosure in connection with a request for stockholder action, a plaintiff need only show a material misstatement or omission. But when seeking post-closing damages for a breach of the duty of disclosure, a plaintiff must prove quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). When proceeding against fiduciaries protected by an exculpatory provision, the plaintiff must plead a non-exculpated claim. *In re Wayport, Inc. Litig.*, 76 A.3d 296, 315 (Del. Ch. 2013).

The initial step in analyzing a claim for breach of the duty of disclosure is to evaluate whether the complaint supports an inference that the fiduciary failed to disclose material information. In the course of its *Corwin* analysis, this decision has found it reasonably conceivable that the Schedule 14D-9 contained multiple material misstatements, misleading partial statements, and omissions. The complaint therefore meets the first requirement for a claim for damages for breach of the duty of disclosure.

In the addition to the disclosure issues that this decision discussed for purposes of *Corwin* cleansing, the plaintiff challenges the description in the Schedule 14D-9 of what took place during the Board meeting on January 4, 2018. It is difficult to determine at the pleading stage what actually occurred during that meeting. The plaintiff has cited evidence,

121

obtained in the Section 220 Action, that calls into question the description of the meeting that appears in the minutes, and that same description of events appears in the Schedule 14D-9. The plaintiff therefore has stated a claim based on the disclosures in the Schedule 14D-9 about the events of January 4.

The complaint also satisfies the remaining elements of a claim for breach of the duty of disclosure. At the pleading stage, the complaint need not prove "actual reliance on the disclosure, but simply that there was a material misdisclosure." *Metro Commc'n Corp. BVI v. Adv. Mobilecomm Techs., Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004). "The complaint need not plead that omissions or misleading disclosures were so material that they would cause a reasonable investor to change his vote." *Roche*, 2020 WL 7023896, at *24. By pleading that the disclosures were materially misleading, the plaintiff has pled a claim that satisfies the elements of reliance and causation.

The complaint adequately pleads damages. A plaintiff can plead damages generally, with further "consideration of damages await[ing] a developed record." *Morrison*, 2019 WL 7369431, at *22 n.273. In this case, the plaintiff goes further, alleging that damages are equal to the difference between the value implied by the November LRP and the Transaction price. The plaintiff is entitled to develop the record to support his claim for damages.

The last issue is exculpation. The Officer Defendants are not protected by the Exculpatory Provision, and it is reasonable to infer that they could be liable for the material misstatements or omissions in the Schedule 14D-9. *See In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *11 (Del. Ch. June 18, 2018) (holding complaint stated a

claim for breach of duty of loyalty against director in connection with materially misleading management projections that he prepared "in his capacity as interim CFO"); *Orman*, 794 A.2d at 41 (holding complaint stated a claim for breach of duty of loyalty where it alleged that conflicted defendants "decided what information to include in the Proxy"). At a minimum, the complaint supports a reasonable inference that the Officer Defendants acted recklessly in preparing the Schedule 14D-9, supporting potential liability under a gross negligence standard. *See Roche*, 2020 WL 7023896, at *19–24 (denying motion to dismiss breach of fiduciary duty claim seeking compensatory damages against officer for disclosures in proxy statement); *Baker Hughes*, 2020 WL 6281427, at *15–16 (same).

The Director Defendants are protected by the Exculpatory Provision. The question is therefore whether the complaint pleads a non-exculpated claim against any of the directors.

This decision already has analyzed the application of the Exculpatory Provision to the Sale Process Claims. Just as Denner and Cox were interested in the Transaction for purposes of the Sale Process Claims, they also were interested in the Transaction for purposes of the Disclosure Claims. The Disclosure Claims against them can go forward.

The Disclosure Claims against the other directors survive to the extent they concern the directors' own actions, because the erroneous disclosures as to those matters support an inference that the Director Defendants knew the Schedule 14D-9 was false when issued. *See Columbia Pipeline*, 2021 WL 772562, at *57. It is reasonably conceivable that Posner knew that the disclosures regarding his interactions with Sanofi were false and materially

123

misleading because it concerned his own conduct. It is therefore reasonably conceivable that he acted in bad faith. It is reasonably conceivable that all of the Director Defendants knew that the disclosures regarding Posner's communications with the Board about Sanofi were false and misleading because they would have participated in those conversations. It is also reasonably conceivable that all of the Director Defendants knew that the disclosures regarding the events of January 4 were false and misleading because they participated in those events. It is therefore reasonably conceivable that all of the Director Defendants acted in bad faith regarding those disclosures.

## V.    CONCLUSION

The motions to dismiss Counts I and II are denied. The complaint states at least one viable claim against each of the Director Defendants and Officer Defendants.